[S. F. No. 4213.  In Bank.—April 29, 1908.]

# W. W. YOUNG, Appellant, v. T. Z. BLAKEMAN, Respondent.

BOUNDARY LINE OF CITY LOTS—UNCERTAIN POSITION—AGREED LINE CONFIRMED BY OCCUPATION—TRUE LINE IN LAW.—When adjoining owners of city lots, being uncertain of the true position of the boundary line between them, agree upon its true location, mark it upon the ground, build up to it, and occupy on each side of it for more than thirty years, under such circumstances that substantial loss would be caused by a change of its position, such line becomes, in law, the true line called for by the respective descriptions of the lots, regardless of the accuracy of the agreed location, as it may appear by subsequent measurements.

ID.—OBJECT OF RULE—REPOSE AGAINST STRIFE—RULE BINDING UPON SUCCESSORS.—The object of the rule confirming occupation according to an agreed line, for a period up to or beyond the statute of limitations, is to secure repose against strife, and make titles permanent; and the rule not only binds the parties, but also their successors by subsequent deeds.

ID.—ORAL AGREEMENT FOR DIVISION LINE — STATUTE OF FRAUDS —DIVISION LINE ATTACHED TO DEEDS — TITLE TO EXCESS. — An oral agreement upon a division line, which is established by actual occupation of the parties for the requisite period is not within the statute of frauds.  Title is not thereby transferred; but the division line, when established, attaches itself to the deeds of the respective parties, and simply defines the lands described in each deed, and if more land is given to one than the calls of his deed actually require, he holds the excess by the same tenure that he holds the main body of his lands.  .

ID.—LOTS OCCUPIED BY BUILDINGS FOR STATUTORY PERIOD—LEASE OF LARGE LOT WITH OPTION TO PURCHASE—PRESUMPTION—ESTOPPEL.— Where the adjoining lots were occupied by buildings for the statutory period, the grantee of the lot containing the excess is presumed to take up to the agreed line, and the grantor is estopped from withholding from the grantee possession up to the agreed line; and a subsequent conveyance from his heirs to the appellant for the excess carried no title, unless the purchaser is estopped from claiming the contrary.

ID.—EQUITABLE ESTOPPEL OF PURCHASER — PLEADING — EVIDENCE IN REPLY TO ANSWER.—Where the plaintiff relied upon an equitable estoppel of the purchaser to claim up to the agreed line, pleaded in the answer, he was entitled to offer evidence in reply to the answer without being called upon to plead such equitable estoppel.

ID.—EQUITABLE ESTOPPEL NOT PROVED—DEED UNDER OPTION ATTACHED
TO AGREED BOUNDARY—SETTLEMENT WITH DIFFERENT POSSESSION.—
Where the grantor of the option to purchase held by his building
up to the agreed boundary the purchaser under the option took title
up to that line, as attaching to his deed, without reference to its
description; and a mere agreement by the holder of the option to
sell a smaller strip on the other side of the lot to an adverse
possessor thereof, against whom the grantor of the option laid no
claim, the price of which was merely fixed as the estimated cost of
a suit to quiet the title of the adverse possessor, did not prove
an equitable estoppel of the purchaser, as grantee, to take title to
the agreed lines, he not having been put by the grantor or his
heirs to any election as to that matter. [Beatty, C. J., dissenting.]

APPEAL from a judgment of the Superior Court of the
City and County of San Francisco and from an order de-
nying a new trial. J. C. B. Hebbard, Judge.

The facts are stated in the opinion of the court.

Olney & Olney, and Warren Olney, for Appellant.

T. Z. Blakeman, and Lindley & Eickhoff, for Respondent.

SHAW, J.—This is an action to recover possession of land
and involves the location of the boundaries between the re-
spective lots of the plaintiff and defendant, situated in San
Francisco. The plaintiff appeals from the judgment and
from an order denying his motion for a new trial.

The two principal points urged by the plaintiff are, 1.
That where adjoining owners have agreed upon and es-
tablished a division line, a subsequent deed by one of them
purporting to convey his tract by the original description,
will not convey the title to the grantee up to the agreed
line, if it turns out that the position of the line, according
to the calls of the deed, newly measured, is within the bounds
of his possession and includes less territory on his side than
the agreed line; 2. That the defendant is estopped to claim
the strip in controversy.

1. The action was begun in January, 1903. The defend-
ant's predecessor, Miller, owned the lot which, according to
his title-deeds, was bounded as follows: Beginning 195 feet
easterly from the northeasterly corner of Geary and Dupont
streets and running thence easterly, along the line of Geary

Street, twenty feet; thence northerly at right angles, parallel with Dupont Street, 122 feet and six inches, to Morton Street; thence at right angles westerly along the southerly line of Morton Street twenty feet; thence southerly at right angles 122 feet and six inches to the place of beginning. The plaintiff's predecessor owned a lot which his deeds described in the same manner, except that the point of beginning was situated 175 feet easterly from the northeasterly corner of Geary and Dupont streets. Each owned a lot fronting twenty feet on Geary Street and by their title-deeds the boundary between them was 195 feet westerly from the corner. More than thirty years before the action was begun they agreed upon the location of this division line and established it upon the ground. They and their respective successors have, ever since that time, acquiesced in the location and have erected buildings on their respective lots with walls on the line and have occupied the same for many years, without dispute until shortly before the action was begun.

The buildings on the defendant's lot were erected in 1874. In 1884 Miller, the owner, made a lease of the lot to one Apel, for a term of twenty years, at a fixed rental, inserting therein a clause giving Apel or his assigns an option to purchase the lot, at any time after fifteen years from the date of the agreement, at the price of forty thousand dollars. In pursuance of this lease and option Miller delivered possession of the lot and buildings to Apel. In 1894, Blakeman purchased the lease and option agreement and was given possession of the lot and buildings accordingly and has ever since held possession thereof up to the agreed line in question. During all this period Young and his predecessors under the original title-deeds have had possession of the lot to the west of the division line. After the expiration of the fifteen years Blakeman elected to exercise the option and buy the Miller lot at the price fixed. He made a tender, which was refused, brought suit for specific performance, obtained judgment and received from the heirs of Miller, who died before the suit was begun, a conveyance of the property. (See *Blakeman* v. *Miller*, 136 Cal. 138, [89 Am. St. Rep. 120, 68 Pac. 587].) In all the conveyances of all parties and their predecessors, and in the said lease, the respective lots were described by metes and bounds in the words above given, the

Blakeman lot being described as a lot beginning 195 feet west of Dupont Street and the Young lot as a lot beginning 175 feet west thereof, without mention of any monument at the division line, or of any agreement regarding the same. Dupont Street is now known as Grant Avenue. After the execution of the deed to Blakeman by the Miller heirs, they set up a claim to a strip of land on the west side of the lot 9⅜ inches wide on Geary Street and 13⅜ inches wide on Morton Street. This strip they quitclaimed to Young, who thereupon brought this suit for possession thereof. The subjoined plat, though not drawn exactly to scale, illustrates the position of the lots.

When the division line of adjoining owners is designated in their respective deeds as a line beginning at a specified distance from a fixed object, the only method of ascertaining the location of the line on the ground is by measuring the required distance from the object. Experience shows that such measurements, made at different times by different persons with different instruments, will usually vary somewhat. The position of the object or monument at which the course begins may also be changed and the change may not be known to the parties, or there may be no means of ascertaining its

original position. If the position of the line always re-
mained to be ascertained by measurement alone, the result
would be that it would not be a fixed boundary, but would be
subject to change with every new measurement. Such un-
certainty and instability in the title to land would be intoler-
able. For these and other reasons the rule has been established
that when such owners, being uncertain of the true position
of the boundary so described, agree upon its true location,
mark it upon the ground, or build up to it, occupy on each
side up to the place thus fixed and acquiesce in such location
for a period equal to the statute of limitations, or under such
circumstances that substantial loss would be caused by a
change of its position, such line becomes, in law, the true
line called for by the respective descriptions, regardless of
the accuracy of the agreed location, as it may appear by
subsequent measurements. The court found that the line in
question had been thus located by the predecessors in interest
of the parties, more than thirty years before the suit was be-
gun. The evidence of the fact, though entirely circum-
stantial, is reasonably satisfactory.

It is conceded that such location is binding upon the parties
who own the respective lots at the time the agreement is
made, while their ownership continues. The plaintiff's
theory is that the agreed line is good only between the original
parties and suffices to mark the line called for by the descrip-
tion only with respect to the deeds under which they hold;
that if one of these owners transfers his lot by a deed giving
only the original description, delivering possession up to the
agreed line, the vendee would not take title to the agreed
line, but only to the area called for by the metes and bounds
of the deed; that the subject is reopened for settlement be-
tween him and his grantor and if, upon a new measurement,
it is found that part of the vendor's holding lies outside of
the newly measured line and between that and the agreed
line, the vendor will remain the owner thereof and may convey
it to another, or recover the possession thereof from the ven-
dee. His argument is that the vendor, in such a case, is the
owner of the intervening strip by adverse possession against
the adjoining owner, and not by his original title-deeds, and
that a conveyance by the original description will not carry
title to the land acquired by such adverse possession.

The object of the rule is to secure repose, to prevent strife and disputes concerning boundaries, and make titles permanent and stable. If it had no greater force than is thus contended for, it would be of little benefit and would fail to accomplish the purposes which led to its establishment. If the descriptions were not by metes and bounds, but designated the lots solely by their respective numbers or, as in the case of government lands, by sectional subdivisions, and there had been an agreement of this character between previous owners fixing the common boundary, it would scarcely be contended that the division line thus fixed is not binding on their respective grantees, or between a subsequent grantor and his grantee. The effect, however, is precisely the same in this case. The designation of the land by its number or sectional subdivision is nothing more than a reference to a previous survey which states the distance of the line from some fixed object and an adoption of that statement into the deed by the reference. It will still call for a measurement to ascertain the true position on the ground, unless it has been marked by a monument and in that case, if the monument is removed and other means of locating its position are not available, as often happens, a measurement must still be resorted to. If a measurement is made and the line agreed on and acquiesced in as required by this rule, it is binding on and applicable to all parties to the agreement and their successors by subsequent deeds. It is stated by the authorities that the line so agreed on becomes in legal effect the true line, that the agreement as to the line may be in parol and that it does not operate to convey title to the land which may lie between the agreed line and the true line, but that it fixes the line itself and the description carries title up to the agreed line, regardless of its accuracy; that the agreement as to the line is not in violation of the statute of frauds, because it does not transfer title; that the parties hold up to the agreed line by virtue of their original deeds and not by virtue of the parol agreement; that "the division line when thus established, attaches itself to the deeds of the respective parties, and simply defines, not adds to, the lands described in each deed," and that if more is thus given to one than the calls of his deed actually requires, he "holds the excess by the same tenure that he holds the main body of his lands."

(*Sneed* v. *Osborn,* 25 Cal. 630; *White* v. *Spreckels,* 75 Cal.
616, [17 Pac. 715]; 4 Am. & Eng. Ency. of Law, p. 861; 3
Wash. on Real Prop., sec. 2232; *Lewis* v. *Ogram,* 149 Cal.
509, [117 Am. St. Rep. 151, 87 Pac. 60], and cases there cited;
*Kellogg* v. *Smith,* 7 Cush. 382; *Miles* v. *Barrows,* 122 Mass.
579.)

There is as much reason for the application of this rule to
a grantor, so as to estop him from withholding from his
grantee the possession up to the agreed line, or from asserting
title to any part of the granted premises within the agreed
line, as for applying it to the respective coterminous owners.
Where land is occupied by buildings up to the agreed line, as
in this case, the grantee is presumed to have bought the
property with a view to the boundaries thus visibly marked
and to have relied thereon and fixed the price according to
the value of the property as thus defined and used. There is
every reason that the grantor should be estopped to claim the
contrary. In 1884, when Miller agreed to sell the property
to Apel after fifteen years for forty thousand dollars, the
buildings were on the land in the same position as when this
suit was begun, and they served to mark the boundaries. It
is to be presumed that it was the land thus built upon, used,
and occupied, which Miller agreed to sell and Apel agreed to
buy. It was this land and building that Miller delivered to
Apel in pursuance of the agreement and of which Blakeman
obtained possession in 1894, when he succeeded to Apel's
right under that agreement. A boundary line thus fixed
and marked has the same effect as a monument erected to
mark a point in a survey; the distance does not control and
the course runs to the monument, or to the agreed termina-
tion. A conveyance by the original description, executed
after the line has been thus established, will be presumed to
have been intended to refer to the distance as fixed by the
agreement and marked by the occupancy in pursuance thereof,
unless there is something in the deed or in the attending cir-
cumstances to rebut the presumption, which is not the case
here.

It may be remarked that there is no evidence that any
subsequent survey has been made by which the true line is
located at the exact point claimed by the plaintiff. There is a
reference to a recent survey in the testimony of the plaintiff,

but he does not give the results disclosed thereby. From the agreement between the heirs of Miller and Blakeman, to be hereinafter noticed, it may be inferred, by the aid of other evidence, that the true east line of the Blakeman lot is about seven inches east of the east line of his building. But this would not prove that the west line of his lot was an average distance of about eleven inches east of the west line of the building as claimed by plaintiff. The building is exactly twenty feet in width. There is a finding to the effect that a line 195 feet easterly from Grant Avenue would fall east of the agreed line the exact distance of the strip in dispute, *according to the location of Grant Avenue as "established at the time when this action was commenced."* No evidence appears corresponding to this finding. But conceding its truth, it does not follow that the line of Grant Avenue was at the same place as that occupied by Dupont Street in 1863 when the defendant's lot was first measured and located therefrom, or when the agreed line was established, or in 1884, when Apel received possession from Miller.

Our conclusion is that the effect of the deed to Blakeman by the heirs of Miller was to convey title to Blakeman, up to the agreed line on the west side of the lot, and that the subsequent deed from them to Young of the strip in controversy, carried no title, unless Blakeman is estopped to claim that strip by reason of the transaction now to be considered.

2. The main contention of the appellant is that the defendant is estopped to claim the strip in dispute. It is objected that the estoppel was not pleaded. Under our system of pleading no reply is allowed and if the plaintiff claims an estoppel against the defenses set up in the answer, he is entitled to give evidence concerning the same without plea. The rule that estoppels must be pleaded does not apply in such cases. The question presented for our consideration is whether or not the evidence established the estoppel claimed.

While the suit of Blakeman against the Miller heirs for specific performance was pending, one Rosenstock, being about to purchase the lot adjoining Blakeman's lot on the east, was informed that the building on that lot extended over the west line thereof upon the lot described in the deeds to the Blakeman lot, covering a strip of the latter 7¾ inches wide at

the north end and 6⅞ inches wide at the south end. Wishing
to settle all disputes about his boundary and title before buy-
ing, Rosenstock asked Blakeman to make him a quitclaim
deed for this strip. This was agreed to and Rosenstock agreed
to pay two thousand dollars for the deed. To satisfy his
fears Rosenstock required that the Miller heirs should join in
quitclaiming to him. Blakeman and the Millers thereupon
executed a written agreement, reciting the description of the
Blakeman lot as hereinbefore given, the pending suit for
specific performance, and, in effect, that the west wall of the
Rosenstock building projected over the east line of the lot
as thus described and bounded, covering the strip proposed to
be quitclaimed to Rosenstock, and providing that the two thou-
sand dollars should be deposited with a trust company to be
by it held until the suit for performance was determined and
then paid to the party who should finally prevail in said suit,
whereupon both parties should quitclaim to Rosenstock the
strip covered by his building. This agreement was carried
out, the suit terminated in favor of Blakeman, the two
thousand dollars was paid to him, and he and the Millers, by
separate deeds, quitclaimed to Rosenstock. Thereafter the
Millers, as before stated, quitclaimed to Young the strip on
the west side of Blakeman's lot, covered by Blakeman's
building and described in the complaint, claiming, as it now
appears, that by reason of the conduct of Blakeman in as-
serting title to the strip on the east side and receiving the
two thousand dollars from Rosenstock, he is estopped to claim
title to the strip on the west side, even if their deed to him
did have the effect of transferring the title up to the agreed
line and beyond the true theoretical line. The evidence
shows that Blakeman, in making the arrangement with Rosen-
stock for the payment of the two thousand dollars did not
fix that sum as the value of the strip to be conveyed to Rosen-
stock, but only as the amount which he estimated it might
cost him to quiet his title to the land claimed and occupied
by him on the west side of his lot.

We are of the opinion that the circumstances under which
this agreement was made and executed did not create an
estoppel as claimed. As we have seen, the instruments
concerning the lot, executed after the agreed line was
established, operated to convey title to the agreed line.

Hence, the option agreement with Apel bound the Millers to convey title to Blakeman, the assignee thereof, up to that line, and their deed in pursuance thereof transferred that title to Blakeman. The result of the suit for performance showed that the Millers had no legal defense to the suit and that they were bound to convey as agreed. It is clearly apparent from the whole case, that neither the Millers nor Blakeman had ever previously claimed title to the land under the Rosenstock building, and that Rosenstock's vendor had a good title thereto by adverse possession, if not by his title-deeds. Blakeman did not in any manner impose on the Millers, or conceal anything from them. It does not appear that the Millers were then claiming that they were not bound to convey to Blakeman the strip on the west side of the Blakeman lot, if they were bound to convey at all. Their defense to the suit for performance made no reference to any mistake in the boundary on either side of the lot, but was founded on other circumstances having no relation to the boundary lines. There is nothing to indicate that either party contemplated or claimed that, if Blakeman won the suit and the two thousand dollars, it would in any manner affect his right to a conveyance of all the land included in the Apel option up to the agreed line, or would give the Millers, after executing the conveyance, any right to a strip including the greater part of the Blakeman west wall. The respective values of the two strips are not shown. But as the east side strip was in the adverse possession of Rosenstock, and was only an average of seven inches wide, while the west side strip in Blakeman's possession, was of an average width of eleven inches, and the Miller deed would give him title thereto, and as it included part of his wall, so that if he had to relinquish it, he would be compelled to take down his west wall and reconstruct it again at a point eleven inches further east, it is reasonably certain that the strip on the west side was worth far more, and probably twice as much, as the strip deeded to Rosenstock. If Blakeman had understood that he was required to elect whether he would take one or the other and could not have both, as against the Millers, if he prevailed in the pending suit, it is not improbable that he would have refused to make any agreement with them, or with Rosenstock, to accept two thousand dollars in lieu of

his rights, and that he would have chosen to retain his rights in the strip on the west side. His relations with the Millers, however, were not of a character to put him to such election and he was entitled by his contract to a conveyance of all their rights in the premises. The most reasonable conclusion from the entire transaction as shown by the evidence is that both the Millers and Blakeman considered the two thousand dollars as equivalent to the expense of quieting the title to the strip on the west side of the lot, and that it was to go for that purpose to the party who succeeded in gaining title to the lot in the suit for performance. This would not give the losing party any right whatever, either to the two thousand dollars or to any part of the land. The plaintiff is claiming by virtue of what is usually designated as an equitable estoppel. If the defendant were held to be estopped, under the circumstances, it would clearly be an unjust and inequitable estoppel. The court was fully justified in refusing to make any finding on the subject of estoppel on the ground that the evidence was insufficient to establish any estoppel.

The judgment and order are affirmed.

Angellotti, J., Sloss, J., Henshaw, J., and Lorigan, J., concurred.

McFarland, J., expressed no opinion.

BEATTY, C. J., dissenting.—I dissent. Blakeman, after demanding and receiving the two thousand dollars paid by Rosenstock for the strip on the east of the Miller building, in my opinion, is estopped to claim the strip on the west under his conveyance from the Miller heirs. They were bound by their father's agreement to convey to Blakeman as assignee of Apel a twenty-foot lot and no more. Conceding that a conveyance according to the description in that contract might have been claimed by Blakeman to effect a transfer of the twenty feet covered by the building, he could not claim at the same time that it would transfer the strip east of the building which Rosenstock was desiring to acquire. Blakeman must be held to have known what he was seeking by his suit for specific performance, and to have known that if he took the strip on one side he must relinquish that on the

other. He made his election when he claimed the price of the strip on the east, and the decree and conveyance by which he got the legal title accurately described the particular twenty feet which he elected to take. The strip in controversy is not included in that description and remained to the Miller heirs who conveyed it to plaintiff. He had the title, legal and equitable, and should have prevailed.