**GULF PRODUCTION CO. et al. v. BATON et al.**

No. 5137.

Court of Civil Appeals of Texas. Texarkana.

Sept. 30, 1937.

Rehearing Denied Oct. 7, 1937.

R. F. Carter, B. C. Clark, John Broughton, and Jno. E. Green, Jr., all of Houston, and Brachfield & Wolfe, Smith & West, and Stone & Wells, all of Henderson, for appellants.

Mayfield, Grisham & Grisham, Lasseter, Simpson & Spruiell, and F. W. Fischer, all of Tyler, A. A. Garrett, of Overton, and J. A. Lantz, of Austin, for appellees.

HALL, Justice.

This suit affects the title to 1.43 acres of land, a part of the Mary Cogswell survey in Rusk county, Tex. William Baton in 1877 purchased a tract of land, a part of the Mary Cogswell survey in Rusk county, containing 111.3 acres. He died in 1889, leaving a wife, Mariah Baton, and four children surviving him. One of the children, Ollie, died soon thereafter, unmarried and without issue. In 1913 another child J. D. Baton, died, leaving three minor children, Grace, Nannie D., and John. Mariah, the wife of William Baton, died in 1912. In 1914 the minor children of J. D. Baton brought suit in district court of Rusk county against O. R. and Hosea Baton, the remaining surviving children of William and Mariah Baton, for partition of the estate of William and Mariah Baton. The court rendered a judgment partitioning said estate, awarding to the minor children of J. D. Baton a tract of land in the Chisum survey and to O. R. Baton and Hosea Baton the west and east halves, respectively, of the 111.3-acre tract in the Mary Cogswell survey.

Some time prior to September 11, 1930, O. R. Baton and Hosea Baton leased their respective parts of the 111.3-acre tract to Roy Laird, who sold same to the Devonian Oil Company. The leases covering said two tracts of land were, at the request of Laird, made directly from the Batons to the Devonian Oil Company. Subsequently, on June 13, 1931, the Devonian Oil Company assigned a one-half undivided interest in the two leases covering these two tracts of land to the Gulf Production Company. On November 9, 1932, the children of J. D. Baton, deceased, instituted suit in the district court of Rusk county against O. R. and Hosea Baton for partition of a claimed 1.43-acre strip lying adjacent on the west of the field note description of the O. R. Baton one-half of the 111.3-acre tract; and on November 26, 1932, judgment of partition was entered awarding to plaintiffs as heirs of J. D. Baton the north one-third of said 1.43-acre strip of land, and to Hosea and O. R. Baton the middle and south one-third, respectively. Appellants were not parties to that suit.

This suit was filed on March 11, 1933, by the Gulf Production Company and Devonian Oil Company, appellants, against the Batons, R. E. Moore, W. P. Pearce, Overton Refining Company, Kilgore Refining Company, and others not parties to this appeal, for title and possession of the 1.43-acre strip of land in controversy. O. R. Baton and Hosea Baton answered to the effect that the original lease from them to Roy Laird did not cover nor include the 1.43-acre strip in controversy. (This lease was never recorded, and, so far as this record is concerned, has never been accounted for). That they executed at the request

of Roy Laird a lease covering both halves of the 111.3-acre tract direct to the Devonian Oil Company in order to avoid certain filing fees. That Laird represented to them that the only difference between the lease from the Batons to him and the proposed lease from them to the Devonian Oil Company was the name of the lessee. In all other respects they were identical. That they were informed at the time of filing their answers in this case that the lease from them to the Devonian Oil Company contained an "all-inclusive" clause which was not in the first lease to Laird. That they executed the lease direct to the Devonian Oil Company in reliance upon the representations of Laird that the two leases were identical with the exception of the name of the lessee. That said representations were fraudulently made by Laird as agent for the Devonian Oil Company. They prayed that the "all-inclusive" clause be stricken because of said fraudulent representations on the part of Laird; or, in the alternative, that said clause was inserted in their lease to the Devonian Oil Company through mutual mistake of the parties and same should be reformed so as to exclude said clause. By supplemental petition appellants interposed the four-year statute of limitation against the defense of fraud and mutual mistake, and alleged, further, that the Batons had ratified the said lease to Devonian Oil Company by later executing mineral deeds which recognized said leases and were therefore estopped to attack same. This plea of limitation was answered by appellees Pearce and Moore and the Batons that they had no knowledge that the "all-inclusive" clause was contained in said last leases until in 1932 or 1933 and that the four-year statute of limitation would not bar them. Appellees Pearce and Moore in their answer claimed a leasehold interest from O. R. and Hosea Baton to the middle and south thirds of the strip in controversy as good-faith purchasers for value without notice of any claim of appellants. They had completed an oil well thereon, and, in event judgment should be against them, they sought the value of the improvements. Appellee Overton Refining Company's answer was similar to that of Pearce's and Moore's, except they claimed a leasehold interest of the north third of the strip of land in controversy from the heirs of J. D. Baton. All appellees also answered by general denial and plea of not guilty. Saltmount Oil Company and W. A. Haynes intervened, each alleging ownership of one-fourth undivided interest in the minerals in and under said 1.43 acres, for an accounting and for damages for their proportionate part of the oil run from the wells drilled thereon by Pearce and Moore and Overton Refining Company. Saltmount Oil Company did not appeal.

Trial was to a jury on special issues which were answered favorably to appellees, and judgment was entered that appellants take nothing by their suit. From this judgment appellants prosecute this appeal.

Appellants' first proposition is: "It appearing from the uncontradicted evidence that a controversy existed between Mariah Baton and her three sons, J. D., O. R., and Hosea Baton, on the one hand, and their neighbor, Ben Bean, on the other, with reference to the true location of the boundary line between the properties of the Batons and Ben Bean, and that this controversy was settled and adjusted by the parties agreeing upon the location of such boundary; and it further appearing that the boundary had become established and had been recognized and acquiesced in as the line between the two tracts for many years; that the Baton tract was established on the ground and enclosed by fences which included the strip in controversy; that the tract had been partitioned and possession of the west end delivered to O. R. Baton as one complete tract, the Court erred in refusing to grant plaintiffs' motion for an instructed verdict and in refusing to grant plaintiffs' motion for judgment non obstante veredicto, and further erred in submitting to the jury Special Issue No. 1, wherein the jury was asked to find whether the Batons acquired title to the strip in controversy in consideration of clearing land belonging to Ben Bean, over plaintiffs' objection that there was no evidence to show that Ben Bean was attempting to divest himself of or that the Batons were trying to acquire title to any land belonging to Bean."

It appears from the record that about 1895, after the death of William Baton, father and grandfather of some of the appellees, and the original purchaser of the 111.3 acres of the Cogswell survey, the Batons began clearing up some land on what they thought was the west end of their 111.3-acre tract. This land was not under fence, but was what is termed "in the woods." A negro by name of Ben Bean owned a tract of land joining the Batons' land on the west. The evidence shows conclusively that at the time the Batons and

their brother-in-law, Swanson, cleared this land the boundary line between said land and Ben Bean's land to the west was not definitely known. The Batons and Swanson thought the cleared land belonged to them, and Bean thought it belonged to him. The dispute was so acute that Bean and Swanson became "hostile," and Bean employed a surveyor to run the line dividing the two tracts of land. The boundary line as run out by this surveyor showed a portion of the clearing done by Baton and Swanson to be on Bean's land. With respect to this feature of the case, Hosea Baton, one of the appellees, testified by deposition as follows:

"Q. State whether or not, if you know, a survey was made on the part of the Batons or Beans to determine as to whether or not you had cleared some of the timber over on and off of the Bean land. A. Yes, sir; Bean he got an engineer out there to survey his tract of land and he finds out that we had cleared beyond his east line.

"Q. Do you recall about how far that you had cleared over on—over on his land and beyond his east line? A. We had cleared something like a hundred feet or more.

"Q. At that time was there— A. That is, my brother-in-law had.

"Q. Beg your pardon? A. This brother-in-law did most of the clearing, understand?

"Q. Yes, at that time was there any discussion as between you folks and Bean as to where this fence should be established? A. Yes, sir.

"Q. Evidencing the west line of the Baton tract? A. This discussion arose from this engineer. At that time he did a considerable bunch of surveying around there—that immediate vicinity, you see.

"Q. Uh-huh. A. And some of the folks said, 'He is a jackleg—he's a jackleg'; and naturally we called him a jackleg, too—but Bean said, 'Well, boys, you cleared this strip of land, put your fence here, if you are over on—if he is mistaken why I will just give you that for clearing the balance down here.'

"Q. All right. Now, and did you put the fence on the line? A. We put the fence—

"Q. Where you and Bean agreed at that time? A. Where he agreed for us to put it.

"Q. How far west, if any, than the field note boundary lines according to the field notes of your tract of land? A. Well, we supposed it to be about fifty feet.

"Q. All right, was it or not? A. No, it wasn't.

"Q. Approximately how far was it? A. It was 48 feet on the north end. * * *

"Q. * * * Just take your time, Mr. Baton, your brother-in-law Swanson and probably other members of your family cleared the woodland off of the west side of the Baton tract? Is that right? A. That's right.

"Q. And in clearing the land not knowing where—actually where the west boundary line of the Baton tract was, you cleared a part of the timber and woodland off of the east side of the Bean tract. Is that correct? A. That's correct.

"Q. And that after you had the conversation with Bean that you have heretofore related, you established a fence purporting to be the west line of the Baton tract. Is that correct? A. That's correct.

"Q. That was during the 90's, is that right? A. That's right, yes, sir.

"Q. And when you did establish that fence, built it, constructed it, it included the strip that is now in controversy in this litigation, is that correct? A. That's correct.

"Q. I'll ask you whether or not that strip of land has been under fence since, we will say, 1900 up until 1932, fence in and a part of the Baton 111 acres-and-a-fraction tract? A. Yes.

"Q. So far as the fence is concerned, is that right? A. So far as the fence is concerned."

This same party when called as a witness testified with respect to the boundary line between the Batons' land and Bean's land as follows:

"Q. And you all were not satisfied with that survey, were you? A. We had to be.

"Q. I didn't ask you whether or not you had to be, but were you satisfied with it? A. Yes, we were satisfied we had got on the other man's land.

"Q. Didn't you say that your brother-in-law got sort of mad about it? A. He got sort of hostile. . .

"Q. He got sort of hostile on account of Bean claiming he cleared on his land? A. Yes, sir.

"Q. So far as Swanson and Bean was concerned, he was not satisfied with what the land surveyor did? A. I couldn't tell whether he was satisfied or not.

"Q. But he told Ben Bean that the surveyor was wrong? A. Maybe he did, I don't know.

"Q. Didn't you say they called him a jackleg surveyor? A. A jackleg surveyor?

"Q. Yes. A. No, I don't think I said that.

"Q. You never said that? A. No, sir.

"Q. Didn't you say that in your deposition? A. I might have.

"Q. Don't you remember that you all denominated him as a jackleg surveyor? A. Well, you get a bunch of men out that way and they are liable to say anything.

"Q. Anyhow you were all dissatisfied with this survey of the surveyor whoever he was and the survey he had made? A. Yes, we really thought he ought to give us the whole world, I reckon.

"Q. Do what? A. Give us the whole world.

"Q. Give you the world? A. Yes, sir.

"Q. You were not intending to take any of Ben Bean's land, were you? A. Not intentionally.

"Q. How is that? A. Not intentionally.

"Q. And if you got over there at all it was by mistake? A. Yes, sir.

"Q. And when Ben Bean got the surveyor out there how much had you gone over on his land? A. About 100 feet.

"Q. And Ben Bean claimed you had gone over 100 feet on him? A. Yes, sir.

"Q. Did Swanson agree that he had gone over that far? A. Yes, sir.

"Q. And he told him it was all right and didn't get mad about it? A. He got mad because he cleared so much.

"Q. Then after he did that then Ben Bean agreed with you all that you could put your line at a certain place? A. That we could put our fence at a certain place?

"Q. And that would be the line between you? A. Between us and Bean.

"Q. That would be the line and it started there and run south until it struck the south line of the Mary Cogswell Survey? Is that correct? A. Yes.

"Q. That is correct? A. Yes, sir.

"Q. And from that time on Ben Bean did not claim any land on the east side of that fence and you all did not claim any land on the west side of that fence? A. No.

"Q. Is that correct? A. That is correct.

"Q. You then built a fence on that line, didn't you? A. There was not any line there.

"Q. I mean where you all agreed the fence would be? A. Yes."

This witness further testified that they did not build the fence any farther south than the road, but that Bean constructed the fence from the road south. This witness was the older of the Baton heirs and seems to have had more to do with the establishing of the boundary line between Batons and Bean than the others.

■ As before stated, this line was agreed to in the 90's and acquiesced in by all parties until about 1932. So we think we are justified in concluding from all the testimony that this dividing line was agreed to by the Batons and Bean around 1895, and was acquiesced in by all parties concerned for over 30 years. This, we think, meets all the requirements of the law with respect to an agreed boundary line; and that this fence did in fact constitute the boundary line between the Batons' and Bean's tracts of land. This is true for the reason that all parties concerned have recognized it as such since it was first constructed, and since that time Bean has not claimed any land on the Baton side of the fence, nor have the Batons claimed any land on the Bean side; and, so far as we are able to discern from the record, this fence established and constructed in the '90's settled all controversy between the Batons and Bean respecting their division line.

■ In Ferrill v. Bryson (Tex.Civ.App.) 37 S.W.(2d) 841, writ refused, it is said: "Where the true line between the parties is in doubt, and there is a dispute as to its true location, the parties may, by oral agreement, locate the line on what they consider to be the true line, and such agreement will be binding on the parties, notwithstanding it may later be ascertained that the line was not established on its true location."

In our opinion, this decision sets forth the law of this state with respect to an agreed boundary line. We could cite many more but deem it unnecessary. First, there must be a dispute as to the true boundary line, its location must be in doubt; and,

second, the line fixed by the landowners must be agreed to as the dividing line between their adjoining lands. When this is accomplished, not only will the parties to the agreed boundary line be bound by its location, but also all subsequent purchasers. Hay v. Briley (Tex.Civ.App.) 43 S. W.(2d) 301, and cases there cited.

■ At the time of the partition of the estate of William and Mariah Baton among their heirs, the agreed boundary line between the 111.3-acre tract and the Ben Bean land had been established about 17 years, and had been acquiesced in by all the interested parties for the same length of time. Said agreed boundary line was marked by a fence since shortly after it was agreed upon. In these circumstances the field note description of O. R. Baton's portion of the 111.3-acre tract would carry and extend to the agreed boundary line on the west. Young v. Blakeman, 153 Cal. 477, 95 P. 888, cited with approval in Hay v. Briley, supra.

The fact as contended by appellees that the strip in controversy was given to the Batons by Bean in consideration of their having cleared over on the east end of Bean's land, and that the fence was placed so as to divide the cleared portion, would, in our opinion, make no material difference in the disposition of this case. The whole situation had its inception in a dispute as to the location of the true west boundary line of the Baton 111.3-acre tract of land and the east boundary line of the Ben Bean tract, and this fence was built by agreement of the parties, maybe not on the true dividing line between the two tracts of land, but on a line which was to settle their dispute for all time, and it accomplished that purpose for over 30 years. In Lecomte v. Toudouze, 82 Tex. 208, 17 S.W. 1047, 1049, 27 Am.St.Rep. 870, it is said:

"Toudouze further testified that, a few days before Locke made the survey, Octavie Lecomte, plaintiff, came to his house, and requested him to go with her to her house, and have an agreement with her husband and herself, settling all differences between them about the boundary line. He agreed to go, and, as they walked along to her house, they passed across the land in dispute, and she said: 'Father, we have determined to give you back your land, but you see we have made improvements on same across the Corpus Christi road, and it will be hard on us to lose them.' 'And I told her we would run the line from the river until it reached the road, and then we would turn the line along the road so as to leave them their improvements. She said this was perfectly satisfactory, and thanked me for the concession. When we arrived at the house we had a talk with Leon Lecomte, and there agreed upon how the line should be run, without, however, at that time going over the line, and agreed that we would at once send for Locke to come out and survey and mark it out. I proposed to send my son for him, and Lecomte said no, he would go, but that I had also better send a note, so Locke would be sure and come. Lecomte wrote the note for me, and carried it to Locke. In a few days Locke came out and ran the line as testified to by him, so as to leave Lecomte those improvements as he and witness had agreed with him. Lecomte was along when the line was being run, and agreed to it; and they both expressed themselves as satisfied. In a few days Lecomte moved his fence back from the land in dispute, and put it along the Corpus Christi road on the line as surveyed by Locke, to where the survey stopped. Witness at once built his fence along the line agreed upon from the river to the Corpus Christi road. While he was building the fence the plaintiffs were both at home, and knew what was going on, and made no objection.' This agreement was made in March, 1884, and the fences remained as they were put by the parties immediately after the agreement, and the land remained in possession, it seems from the evidence, of each party, respectively, up to the fence. This suit was brought about 18 months after the agreement. * * *

"It cannot be contended that the facts do not show an agreed boundary. Because the facts in the record tending to establish such agreement are more conclusive and certain in their force and effect than are usually found in cases of this character, when the courts in passing upon the question have repeatedly held the facts sufficient to prove the agreed line."

■ Therefore, in the partition of the 111.3-acre tract between the Baton heirs the west one-half awarded to O. R. Baton would extend to the agreed boundary line on the west between his land and the land of Bean, and would include all the land lying between the line dividing his and his brother Hosea's inheritance and the agreed boundary line on the west. This is not alone true by virtue of the existence of the agreed boundary line, but because the pre-

sumption obtains in this state that, where a tract of land is partitioned among the joint owners, the whole of said land is partitioned unless some portion thereof is expressly excepted, and especially does this presumption obtain in cases similar to the case at bar. And this presumption becomes conclusive when the rights of innocent purchasers are involved. Rio Bravo Oil Co. v. Weed, 121 Tex. 427, 50 S.W.(2d) 1080, 85 A.L.R. 391.

■ The judgment of partition in the district court of Rusk county in 1914 awarded to the heirs of J. D. Baton, deceased, and to O. R. and Hosea Baton each a one-third interest in the estate of William and Mariah Baton. The commissioners appointed to partition this estate allotted to each of the parties a one-third interest therein showing conclusively that they were dividing the whole of said estate. This award was effective to give to O. R. Baton title thereafter to all the joint estate up to the agreed boundary line at the west end of the 111.3-acre tract. Dawson v. Hickman (Tex.Civ.App.) 95 S.W.(2d) 1319, writ refused. Moreover, the lease from O. R. Baton to Devonian Oil Company contains this provision: " * * * ' containing 55 acres of land, more or less, *and being the same land partitioned to O. R. Baton by the District Court of Rusk County, Texas.*" (Italics ours). Therefore, we conclude that the one-third of the estate of William and Mariah Baton awarded to O. R. Baton by the decree of partition of the district court of Rusk county in 1914 included the 1.43-acre tract here in controversy, and that same was included in his mineral lease to Devonian Oil Company.

Appellants by their twelfth proposition assert: "It appearing from the uncontroverted evidence in this case that the defendants Pearce and Moore and Overton Refining Company drilled wells on the strip of land in controversy after having had actual and constructive notice that the plaintiffs were claiming title to said strip, they could not as a matter of law show that they had improved the property in good faith and were entitled to the value of such improvements."

■ We do not agree with this proposition. Certainly the notice to these parties and the facts revealed by the record were sufficient to defeat any asserted title as innocent purchasers for value to the leasehold interest in the land in controversy—

which we unqualifiedly hold—but, in our opinion, a different rule governs the conduct of persons who make improvements on property in good faith in reliance on their claim of title. This difference is recognized and made very clear by Judge Smedley of the Commission of Appeals in Gulf Production Co. v. Spear, 125 Tex. 530, 84 S.W.(2d) 452, 457, opinion adopted by Supreme Court, wherein it is said:

"Plaintiffs in error ask for rendition of judgment in their favor for the value of oil produced up to January 1, 1933, from a well which certain of defendants in error, claiming under the lease to Houston, drilled upon the land in controversy. They take the position that they are entitled to the value of the oil taken as shown by the undisputed evidence, without deduction for expenditures made in drilling, equipping, and operating the well, because there are no sufficient allegations of good faith in the making of the expenditures and because the uncontradicted evidence shows a want of good faith. While the pleadings of defendants in error do not allege good faith with particularity, we think that the pleadings taken as a whole and the evidence offered were sufficient to present and raise the issue. * * *

"The question of the good faith of defendants in error in entering upon the land and developing it is in this case, as it usually is, one of fact. Holstein v. Adams, 72 Tex. 485, 490, 10 S.W. 560; Pomeroy v. Pearce (Tex.Com.App.) 2 S.W.(2d) 431; 12 Texas Law Review, pp. 210, 218. * * *

"It should be added that the ruling herein made to the effect that Houston's assignees did not become innocent purchasers for value of the leasehold estate is not decisive of the question of good faith in the entry upon the land and its development for oil. One may be a possessor in good faith and yet not the owner of the better title and not an innocent purchaser for value. Dorn v. Dunham, 24 Tex. 366, 379, 380. * * *

"Good faith under one state of facts would not be good faith under a slightly different state of facts. In general, it may be said that to act in good faith in developing a tract of land for oil or gas one must have both an honest and a reasonable belief in the superiority of his title.".

Special reference is made to the cases cited in the above-quoted opinion as bearing upon the question here under discus-

sion. Broughton v. Humble Oil & Refining Co. (Tex.Civ.App.) 105 S.W.(2d) 480, writ refused.

We have examined the record herein and conclude that it presents facts sufficient to sustain the jury's findings that the improvements were in good faith placed upon the land in controversy. It is not deemed necessary to discuss the other assignments brought forward.

We are unable to enter the proper judgment respecting this phase of the case, and, in view of the stipulation in the record between the parties hereto, we remand this case to the court below for an accounting of the amount and value of the oil run from, and the value of the improvements placed upon, this land by appellees Overton Refining Company and Pearce and Moore, and for allowance to these appellees proper credit for their improvements. We hold, further, that appellees Overton Refining Company, and Pearce and Moore are liable to appellant W. A. Haynes for his one-fourth of the one-eighth royalty of oil run from the two oil wells upon the land in controversy, without deductions for any improvements thereon, an accounting of which is also referred to the court below. In all other respects, the judgment of the district court is reversed, and judgment is here rendered for appellants.