[Civ. No. 3521. Fifth Dist. Aug. 23, 1978.]

EDWARD JAMES JOAQUIN et al., Plaintiffs and Respondents, v. SHILOH ORCHARDS, Defendant and Appellant.

COUNSEL

Zuckerman & Hartmann and Thomas M. Zuckerman for Defendant and Appellant.

A. M. Frad for Plaintiffs and Respondents.

## OPINION

## FRANSON, J.—

### INTRODUCTION

The fundamental question presented by this quiet title action is the extent of the trial court's obligation to fix the location of an agreed boundary between contiguous owners of land where the monument fixing the line (a fence) has been removed without a survey or other marking to identify its precise location. ■ As we shall explain, the trial court is required to fix the location of the agreed boundary according to the evidence presented at trial if it is reasonably possible to do so. Thus, in the present case the court erred in refusing to determine the location of the agreed boundary and in quieting title in respondents according to their complaint.

### STATEMENT OF FACTS

Prior to 1942 the Bank of America was the common owner of the adjoining parcels of real property now owned by appellant and respon-

dents, the boundary line of which is the subject of this controversy. On April 6, 1942, the bank sold one parcel to the respondents' predecessors in interest and on March 1, 1943, sold the other parcel to the appellant's predecessor in interest. The deed to both parcels described their common boundary as the quarter section line separating the southwest quarter section from the northwest quarter section of section 19, in township 4 south, range 8 east, Mount Diablo Base and Meridian, in the County of Stanislaus. There is a five-inch diameter concrete monument located in Shiloh Road marking the western quarter section corner, which the federal government established in 1854. The monument set at the easterly corner of the section line in 1854 has never been located, but a surveyor reestablished this point in 1974 for a survey of nearby property.

At sometime prior to 1944, a fence was constructed which divided one portion of the property from the other, and the two portions were separately farmed and utilized up to the fence. In addition, the separate farming practices of the adjoining owners over the years created a line demarcing the differing cultural practices, evidenced by a change in elevation or "bench" between the 2 farms at the fence line, ranging from 12 to 36 inches in height. The fence was located at the top of this bench. The area between the fence line and the quarter section line is approximately 2.4 acres.

Respondents acquired their parcel on September 5, 1967, and appellant acquired its parcel on December 28, 1973. At the date of appellant's acquisition, appellant and its predecessors in interest accepted and understood the fence to be the boundary between the respective parcels. Appellant entered into possession of its parcel to the fence and dealt with the property as if the fence constituted the boundary, cultivating and improving its parcel, including the now disputed piece.

In 1974 appellant removed the fence to establish an almond orchard on the property, which it accomplished in 1975. The fence line was removed to help control weeds that had grown along the fence. Appellant used a disc to control the weeds on the old fence line. The effect of the discing was to "round" the bench somewhat, but not enough to extinguish the original line. Appellant leveled the property, installed a sprinkler system, and planted an almond orchard, at the cost of approximately $2,100 per acre.

Appellant's witnesses testified that the location of the fence line could be established. Ronald P. Vella testified that the fence "lined up with the

road across the street" and that the fence ran just north of a roadway used by farmers in the area for access to the irrigation gates at a nearby irrigation canal. Gordon A. Batson also indicated that the fence line could be located in relationship to the canal. He also testified that the assessor's map in use since 1967 appeared to designate the boundary line between the properties in accordance with the location of the fence line.

Keith Chrisman, a registered civil engineer, was retained by appellant four months before trial to survey the location of the old fence line. Mr. Chrisman testified that he located the two quarter section corners that are on the east and west ends of the quarter section line and with a surveyor's transit measured the angle between the center line of Shiloh Road (a north-south section line) and the quarter section line and found the angle to be 89 degrees and 28 minutes. He then measured the angle between the center line of Shiloh Road and the top of the bench, a "very evident physical boundary between the two properties," and found it to be 90 degrees and 54 minutes.[1]

Chrisman then compared his physical measurements of the location of the fence line with a 1957 aerial photo of the property taken by the United States Department of Agriculture, Soil Conservation Service. With a protractor he measured on the photograph the angle between the center line of Shiloh Road and the quarter section line as represented by the visible physical features on the photograph, including the line representing the differences in cultural practices between the two parcels of land, a road adjacent to and south of the cultural line, and the north edge of the irrigation canal. Mr. Chrisman found the angle to be 89 degrees and 20 minutes. He then measured the angle between the center line of Shiloh Road and the cultural boundary line and found it to be 90 degrees, 50 minutes. He then expressed the opinion that the fence line represented by the embankment described by prior witnesses is "very close" to the cultural boundary line shown on the aerial photograph. He explained that by "very close" he meant "somewhere between two to five feet."

---

[1]Mr. Chrisman explained how he surveyed the fence location as follows: He set up a surveyor's transit on the quarter section corner of Shiloh Road and sighted down a line of site on the top of the bench which intersected the quarter section corner "within five or six inches off from hitting it precisely." He then stated that although he did not physically measure the distance between the two lines at the eastern end, he calculated the 74 feet "plus or minus a half a foot" by computing (by geometric equation) the angular difference at a distance of half a mile.

In the course of constructing a power line project, respondents began to suspect that the former fence line might not be the boundary described in the deeds to the respective parcels. Respondents commissioned a land survey, which indicated that the boundary described in the deeds was some distance to the north of the newly planted almond orchard, leaving ownership of a portion of the orchard in dispute and leading to this action.

## TRIAL COURT'S FINDINGS

The trial court found that although a fence had been in existence for many years south of the quarter section line, and the parties and their predecessors had each farmed the land to the fence, causing the formation of an embankment of soil along the fence line, the removal of the fence without a survey or other method of marking its exact location resulted in a loss of appellant's title in the land to the fence. In support of this conclusion, the court found that appellant had disced and broadened the bank after the fence had been removed; that neither the top nor the bottom of the bank as it existed prior to 1974 had been established; and that no remnants of the fence post remaining below ground had been shown. From these findings the court concluded that "[t]he only ascertainable boundary which can be defined in words and which can be translated into monuments on the ground is the common quarter section line as used and described in the recorded deed of each property." It then quieted title in respondents according to the prayer of their complaint.

## THE AGREED BOUNDARY

█ The doctrine of acquiescence to a boundary line is referred to in California as the doctrine of title by agreed boundary. (See *Ernie* v. *Trinity Lutheran Church* (1959) 51 Cal.2d 702, 707 [336 P.2d 525].) It is a mixture of implied agreement and estoppel. (Miller & Starr, Current Law of Cal. Real Estate (1977) § 21:27, pp. 552-559.) The elements of the doctrine are an uncertainty as to the true boundary line, an agreement between the adjacent owners establishing the line, and acceptance and acquiescence in that line. (*Ernie* v. *Trinity Lutheran Church, supra*; *Duncan* v. *Peterson* (1970) 3 Cal.App.3d 607, 611 [83 Cal.Rptr. 744].)

█ The doctrine clearly applies to this case. The inability to locate the eastern quarter section monument demonstrates the requisite uncertainty. The evidence shows that the owners had accepted the fence as the boundary line. "A longstanding acceptance of a fence as a boundary line

gives rise to an inference that there was, in fact, a boundary agreement between the coterminous owners resulting from an uncertainty or dispute as to the location of the true line." (Current Law of Cal. Real Estate, *supra,* § 21:31, p. 562; *Ernie* v. *Trinity Lutheran Church, supra,* 51 Cal.2d 702, 708.)

■ The trial court apparently misunderstood the full legal consequences of the agreed boundary. "[W]hen such owners, being uncertain of the true position of the boundary so described, agree upon its true location, mark it upon the ground, or build up to it, occupy on each side up to the place thus fixed and acquiesce in such location for a period equal to the statute of limitations, or under such circumstances that substantial loss would be caused by a change of its position, *such line becomes, in law, the true line called for by the respective descriptions, regardless of the accuracy of the agreed location, as it may appear by subsequent measurements.*" (Italics added. *Young* v. *Blakeman* (1908) 153 Cal. 477, 481 [95 P. 888]; *Duncan* v. *Peterson, supra,* 3 Cal.App.3d 607, 611.) Once an agreement between parties over an uncertain boundary line is established according to law, the agreement is conclusive as to the correctness of the boundary. (*Martin* v. *Lopes* (1946) 28 Cal.2d 618, 622 [170 P.2d 881]; 2 Cal.Jur.3d, Adjoining Landowners, § 93, p. 146.) The agreement establishes the true boundary line which the parties are estopped to deny. If more land is given to one than the description of his deed actually requires, he holds the excess by legal and not merely equitable title. (*Sneed* v. *Osborn* (1864) 25 Cal. 619, 631; 2 Cal.Jur.3d, *supra,* § 93, p. 146.) Thus, once appellant proved by uncontradicted evidence that the fence line was the agreed boundary separating the two properties, respondents lost their right to quiet title to the quarter section line.

### Uncontradicted Evidence Showing the General Location of the Fence Line

Appellant's witnesses testified that the former fence line could be established. Batson and Vella testified that even though the embankment formed by the different cultural practices had been disced and rounded somewhat, the original line had not been obliterated altogether. Sidney Long testified that the fence had been located at the top of the bank. Vella testified that the fence lined up with a road perpendicular to and west of Shiloh Road. The fence also ran just north of a roadway leading to the irrigation canal. Batson's testimony was similar. He further testified that this line corresponded to the boundary on the assessor's map. Long

testified that he could locate the former fence within one foot on the basis of Vella's description.

Chrisman, the civil engineer, testified that he was able to observe through his transit the top of the embankment from the quarter corner on Shiloh Road down a line of sight to the north edge of the canal. He compared that line with the cultural practices line apparent on the aerial photograph and opined that the two lines were "very close." He explained that the accuracy with which he could read the location and distances of the lines on the aerial photograph was two to five feet.

In sum, the testimony of appellant's witnesses established beyond question that the embankment caused by the cultural practices and on which the fence was located is presently discernible. Hence, the trial court erred in not finding that at least the general location of the fence line had been established. Furthermore, if the trial court felt that it could not determine the precise location of the fence line from the evidence, it could have entered a conditional interlocutory judgment declaring the line to be along the top of the embankment provided that (1) appellant obtained a survey with a metes and bounds description of the agreed boundary line along the embankment and (2) any uncertainty be resolved in respondents' favor. Such a conditional decree would be in keeping with the equitable principles inherent in a quiet title action. (Cf. 4 Witkin, Cal. Procedure (2d ed. 1971) §§ 18-19, pp. 3194-3195.)

The decree quieting title in respondents to the real property described in their complaint is reversed. The matter is remanded to the trial court with directions to receive such additional evidence as either party shall desire to produce and determine the location of the agreed line according to the evidence available.

Brown (G. A.), P. J., and Andreen, J.,* concurred.

A petition for a rehearing was denied September 18, 1978.

---

*Assigned by the Chairperson of the Judicial Council.