[Civ. No. 14643. First Dist., Div. One. June 21, 1951.]

ALVIN B. CARR et al., Appellants, v. R. F. SCHOMBERG et al., Respondents.

Atkinson & Farasyn for Appellants.

Rankin, Oneal, Luckhardt, Center & Hall for Respondents.

PETERS, P. J.—This is a disputed boundary case. The land involved is located in a mountainous area of Santa Clara County. The plaintiffs admittedly own the northwest quarter of the northeast quarter of Section 31, Township 7 South, Range 2 West, M. D. B. & M. The defendants admittedly own the northeast quarter of the northwest quarter of the same section. These two parcels adjoin each other, so that the westerly line of the plaintiffs' parcel is the easterly line of the defendants' parcel. Defendants claim that the questioned boundary runs north and south through a certain sycamore tree, while plaintiffs claim that it runs from and through a certain 2-inch pipe and old hub. The area in dispute between the old hub and the sycamore tree is 575 feet wide. Plaintiffs brought this action to quiet their title to their parcel, including the disputed strip, which runs the length of their west boundary. Defendants denied the material allegations of the complaint, pleaded adverse possession, and cross-complained for an adjudication of their rights in the property. The trial court determined that the proper boundary ran through the sycamore tree, and established that line as the true boundary between the parties. The court found that for more than 20 years prior to the commencement of this action the true dividing boundary between the two parcels was unknown to the respective parties; that the true boundary runs through the sycamore tree; that the respective owners agreed that the boundary should run through the sycamore tree; that since such agreement was entered into more than 20 years ago the defendants and their predecessors in interest have occupied all of the disputed area west of the sycamore tree line and have constructed buildings thereon and have exercised complete and exclusive use, possession and enjoyment of the disputed area; that they have, in addition, paid all taxes thereon and have had actual, notorious, exclusive, peaceable and uninterrupted adverse possession of the area west of the sycamore tree line; that for more than 20 years prior to the commencement of this action plaintiffs have not been seized or possessed of the disputed area. Based on these findings the trial court entered its judgment determining that defendants are the owners of the strip in dispute. Plaintiffs appeal.

Although the evidence is conflicting, the finding that the

true boundary between the two parcels runs through the syca- more tree is supported by the evidence. Likewise, the findings that the parties had agreed upon the sycamore tree line as constituting the true boundary, and that defendants have title by adverse possession are amply supported.

The two adjoining parcels are located in a mountainous area of Santa Clara County. The only usable portion of either parcel is the area included within a canyon through which runs Stevens Creek, which also runs through the disputed strip. This usable area is principally adapted for summer cabins. Defendants or their predecessors, with full knowledge of the plaintiffs or their predecessors, in the disputed area have constructed several houses and sheds, and a swimming pool, all assessed at $1,070.

The respective chains of title of the parties are not in dispute. The Carrs' title is predicated upon a United States patent to N. Ehrhorn, recorded in 1890. In 1943, the property was distributed to Ehrhorn's widow, and her estate sold it to the Carrs in 1946.

The defendants' title evolves from a title in Mason, Sr., dating back to 1913. Mason, Sr., sold to Mason, Jr., in 1929. Mason, Jr., sold to Schomberg in 1942.

After the Carrs purchased their parcel in 1946 the present dispute arose. In 1947, the Carrs employed one James, a civil engineer, to make a survey of their parcel. James made a study of a previous private survey made for Ehrhorn in 1890. James also studied the county records, various maps on file with the county surveyor, official maps of the Department of Interior, and the official notes appertaining thereto. James also hired a surveyor, Nolte by name, to make a field survey. Nolte examined the same documentary material above referred to, and then made a field survey. He testified at great length and quite technically as to his findings. Plaintiffs place their main reliance on his testimony and contend that it is uncontradicted, and urge that it compels a reversal. In substance, Nolte testified that he tried to locate old survey markers; that he found old brushed lines and other survey points from previous surveys; that he found various hubs which he assumed were corner markers; and that, among other things, he discovered, at what he claimed was the northwest corner of the plaintiffs' property, a 2″ pipe behind an old hub inscribed "¼ S." In this general area were found witness and bearing trees as shown on the Ehrhorn private survey of 1890. Some blazed trees and stumps were found,

but on some there were no references, so that they could not be tied in with the survey. Nolte could not testify as to who had set the various hubs found by him. He testified that the brushed lines were about 10 or 15 years old, so that they were more recent than any government survey and more recent than the Ehrhorn survey, and that he did not know who had made them. He admitted that the official government survey did not contain any description of the bearing trees, but some of them appeared in the Ehrhorn survey. He located the hub for the northwest corner of plaintiffs' property within inches of the spot fixed for the same corner in the Ehrhorn survey. Nolte's survey seems to be based primarily on the references in Ehrhorn's map, the result of a private survey.

The main witness for defendants was Williams, a civil engineer and land surveyor. He did not make an actual survey, but he had a crew go out and locate the sycamore tree and make various ties to it. He gave quite a lecture on the proper method of making resurveys, and commented at length on the various maps and notes in evidence. He testified that there had been two government surveys, one in 1868, and one in 1882, and that, as between two government surveys, the later survey is the established one. He put the field notes of the 1882 survey into evidence. He then pointed out that, in its township, section 31 is a "marginal," "closing" or "long" section. A government surveyor, according to this witness, first lays out the township lines, and then subdivides this area into sections. The last section laid out is called a "marginal," "closing" or "long" section, which means that it may be larger or smaller than the standard section, dependent upon how accurately the township lines and the other section lines were laid out. If the Government Rules of Survey were followed, section 31 is such a closing section. This section had a surplus. According to the government rules normally followed, this excess would be put in the westerly half of the section, which would put the disputed strip in defendants' parcel, with the boundary along the line of the sycamore tree. Admittedly, however, the government manual recognizes another method of dividing up this surplus known as the "direct proportional method," which would divide the surplus up among the various quarter sections.

The sycamore tree was blazed with the letters "B.T." and "S.E." Those marks looked like they had been on the tree for a long time, probably since 1910 or 1911.

The government map of 1882 was made from the field notes

of the surveyor. There is a discrepancy in description between the map and the notes which might explain the different interpretations of Nolte and James on one side, and Williams on the other. Admittedly, James did not know of this discrepancy when he made his survey.

Plaintiffs argue that the testimony and map of Nolte established the boundary they claim, emphasizing the fact that his testimony is based upon a survey made by him, while Williams made no survey. They argue that Williams' testimony did not create a conflict, but amounted simply to a lecture on how to make a government survey. It must be conceded that Nolte's testimony would have supported a finding that the disputed strip was within plaintiffs' lands. But the Nolte survey was based primarily upon the Ehrhorn survey of 1890, a private survey. Nolte did not testify that any of the monuments relied upon by him had been fixed by the government resurvey of 1882. Under such circumstances, his evidence was by no means conclusive.

Moreover, Nolte's testimony does not stand uncontradicted. Williams' analysis of the government field notes places the disputed strip within defendants' lands. Under such circumstances, the trial court was justified in finding that the plaintiffs, who must recover, if at all, on the strength of their own title and not upon the weakness of defendants', had not sustained the burden imposed upon them.

Moreover, there is ample evidence to show that the sycamore tree line was an agreed boundary. Mason, Jr., acquired the property now owned by defendants from his father in 1929. His father had owned the property since 1913. Schomberg acquired the property from Mason, Jr., in 1942. When Mason, Jr., acquired the property, Ehrhorn owned the parcel now owned by plaintiffs. Mason, Jr., testified that, sometime in about 1928, he talked to Ehrhorn about the boundary between the two parcels; that Ehrhorn stated that he did not known exactly where his corners were and asked Mason, Jr., if he knew; that the witness told Ehrhorn that he thought the sycamore tree was on the line; that the two parties went down and looked at the tree, and Ehrhorn stated that the sycamore tree was a "line" or "bearing" tree and that it "suited" him, that it was "satisfactory to him" to treat the sycamore tree as indicating the boundary; that Mason, Jr., suggested that a survey be made, but Ehrhorn refused to pay his share of the expense, stating that the sycamore tree line was satisfactory to him; that at this time the property was

owned by his father, but he, Mason, Jr., then had a verbal agreement with his father to secure an interest in it; that he communicated Ehrhorn's agreement as to the boundary to his father; that both before and after 1929 both of the then owners of the adjoining parcels treated the sycamore tree line as the boundary; that after he purchased the property in 1929 he erected a "no trespass" sign, signed by himself, on the road near the sycamore tree, and a gate was placed in that road. The sign and gate have remained there for over 20 years. He also testified that both adjoining owners always treated the sycamore tree line as the boundary, and that since 1910 the adjoining owners have cut timber on their respective parcels, and each has cut up to the sycamore tree line.

There was evidence that in 1913, when Mason, Sr., bought the property, he pointed out to a witness the sycamore tree as constituting the boundary. In addition, Schomberg testified that he has been familiar with the property since 1915; that beginning in that year Mason, Sr., the then owner, permitted him to go upon the property; that he did so every few weeks; that at that time there were no buildings on this disputed strip; that with Mason, Sr.'s consent he built a house on the disputed strip in 1925, and put in the swimming pool several years later. The hayshed was constructed by Schomberg's daughter and son-in-law about 1944. Since 1925, Schomberg and his family have visited the property nearly every week end. He also testified that when he started to construct the first building in 1925 he had a verbal arrangement with the Masons for the eventual purchase of the parcel.

Plaintiffs and defendants and their predecessors have paid the taxes assessed on their respective parcels, and admittedly the taxes on the improvements. on the disputed area have been assessed to and paid by defendants.

On this evidence the court was justified in finding that the sycamore tree line had been agreed upon as the dividing line between the two parcels. ■ The general theory of the establishment of boundaries by agreement is stated as follows in 4 California Jurisprudence, page 427, section 53 : "If there is an uncertainty or dispute regarding the boundary line of contiguous tracts of land, the owners thereof may agree that a certain line shall be the true division line between their respective tracts; and such agreement, when executed, establishes the boundary line, and estops the parties from afterwards contesting it. It is the policy of the law to give stability

to such an agreement, as being the most satisfactory way of determining the true boundary, and tending to prevent litigation. An agreed boundary line must be accepted as the true line, regardless of the accuracy of such location as shown by subsequent measurements."

The same doctrine, supported by many cases, is also stated as follows in 4 California Jurisprudence, page 432, section 56: "When coterminous owners, being uncertain of the true position of the boundary of their lands, agree upon its true location, mark it upon the ground, or build up to it, occupy on each side up to the place thus fixed and acquiesce in such location for a period equal to the statute of limitations, or under such circumstances that substantial loss would be caused by a change of its position, such line becomes, in law, the true line called for by the respective descriptions, regardless of the accuracy of the agreed location as it may appear by subsequent measurements."

The doctrine has been discussed and amplified in several recent cases. In *Crook* v. *Leinenweaver*, 100 Cal.App.2d 790, 792 [224 P.2d 891], the court discussed the rule as follows: "The doctrine of an agreed boundary line is well settled, and such agreements are favored by the courts. An actual argument or dispute is not necessary in such cases. The essential elements are an uncertainty as to the true position of the boundary and an agreement to accept a location as fixed by the parties. The fact of an agreement may be inferred from acts of the parties. Acquiescence and use of the property, while not controlling, may be considered under some circumstances for their evidentiary value. [Citing cases.]"

In the recent case of *Mello* v. *Weaver*, 36 Cal.2d 456, at page 459 [224 P.2d 691], the Supreme Court had the following to say on the subject:

"The requirements of proof necessary to establish a boundary by agreement are well settled by the decisions in this state. [Citing cases.] Mere agreement to locate a boundary known to be different from that called for by the deeds is insufficient, since such an agreement would be tantamount to a conveyance by parol, an unrecognized method of transfer of real property. [Citing cases.] But as early as *Sneed* v. *Osborn*, 25 Cal. 619, where the position of the initial point in the description was uncertain, a division of land between coterminous owners as in accordance with the deed description, and mutual acquiescence in their practical location of the

common boundary over a long period of time, was held to constitute the location of the true boundary as called for by the deed. The doctrine grew out of the need for stability and repose in the matter of titles to real property. [Citing a case.]

"The agreement need not be express, but may be implied from long acquiescence. [Citing cases.] But since it is valid only for the purpose of settling an uncertainty in a common boundary, the implied agreement must have been based on a doubtful boundary line. [Citing cases.] A dispute or controversy is not essential [citing cases], but it may be evidence of the existence of a doubt or uncertainty. Nor is it a requirement that the uncertainty should appear from the deed or from an attempt to make an accurate survey from the calls in the deed. The fact that an accurate survey is possible is not conclusive of the question whether a doubt existed as to the location of a common boundary. Thus the doubt may arise from a believed uncertainty which may be proved by direct evidence or inferred from the circumstances surrounding the parties at the time which the agreement is deemed to have been made [citing cases]; and if in good faith the parties resolved their doubt by the practical location of the common boundary it will be considered the boundary called for by the deed. [Citing cases.]"

Plaintiffs point out that the only agreement here shown to exist was between Ehrhorn and Mason, Jr., and also point out that such agreement was made in 1928, before Mason, Jr., purchased the property, and contend that such an agreement, made with one not an owner, is of no legal consequence. The evidence shows that Mason, Jr., conveyed the terms of the agreement to his father, and that his father acquiesced in it. The inference is well nigh irresistible that Mason, Sr., ratified the agreement made by his son. Moreover, the evidence is without substantial conflict that both before and after 1928 both of the then owners treated the sycamore tree line as the true boundary. The improvements were constructed on the disputed strip as early as 1925, and Ehrhorn made no objections. The "no trespass" sign clearly delineated the boundary and was in existence for over 20 years. A gate was constructed on the road passing the sycamore tree about 1930, clearly indicating that the disputed strip was claimed by Mason, Jr., and Ehrhorn made no complaint. Under these circumstances, the evidence is sufficient to sustain the finding that the then adjoining owners agreed upon the boundary.

Plaintiffs contend that even if there were an agreement,

it was far too indefinite to be enforceable. In this connection they point out that the agreement merely fixed the sycamore tree as the boundary, and that there was a complete absence of direction or length of the line. They argue that before an agreement fixing the boundary will be enforced, it must fix the line with certainty and mark it upon the ground. They rely on statements appearing in some of the cases that the agreed line must be "marked upon the ground," or that there must be "an actual designation of the line upon the ground." (See *Muchenberger* v. *City of Santa Monica,* 206 Cal. 635 [275 P. 803]; *Roberts* v. *Brae,* 5 Cal.2d 356 [54 P.2d 698]; *Martin* v. *Lopes,* 28 Cal.2d 618 [170 P.2d 881]; *Talmadge* v. *Moore,* 98 Cal.App.2d 481 [220 P.2d 588].)

While it is undoubtedly true that in most of the cases the parties made a more substantial designation of the agreed boundary than was done here, there is no rigid requirement that the boundary must be physically marked on the surface of the ground. The test is whether the parties have agreed upon a dividing line that is clear to them, and that can be made clear to others. The sycamore tree fixed a point on the dividing line between the two parcels. The parties knew that the dividing line ran due north and south. So far as this dispute is concerned, they were not interested in the north and south boundaries of their land, and were not adjoining owners as to the north and south boundaries. Once the sycamore tree was agreed upon as marking the division of the two parcels, the dividing boundary simply ran north and south from that point along the line where the two parcels were contiguous. This is sufficient to establish the disputed boundary. The correct rule is stated as follows in *Needham* v. *Collamer,* 94 Cal.App.2d 609, 612 [211 P.2d 308]: "Defendants further contend that the agreed boundary line cannot be upheld because it is not 'marked upon the ground by a dividing fence or similar monument.' While the actual erection of a fence or like monument along an agreed boundary would have great weight in the fixing of such a boundary such means are not exclusive, since the primary question is one of fact going to the question of whether there was an agreed boundary, and if so by what visible thing was it delineated. Here the evidence shows and the court found that the line was fixed by the plaintiffs and the Moys as running from an iron stake, which had been in position for more than 18 years, to two willow trees on the lake shore; that said line ran 30 inches to the west side of plaintiffs' garage, which garage

had been built by Moy while he occupied the premises and in accordance with his understanding as to the boundary line.''

The findings in reference to adverse possession, contrary to plaintiffs' contentions, are amply supported. The main attack made on these findings is that there is no evidence that defendants or their predecessors paid taxes on the disputed strip for the statutory period. It was stipulated that each owner paid taxes on his specific lands, and that the assessments on the improvements were taxed to defendants.

■ Once it is found that the parties agreed upon a boundary, the payment of taxes according to deed descriptions amounts to payment of taxes on the area up to the agreed-upon boundary. The proper rule was stated as follows in *Price* v. *De Reyes*, 161 Cal. 484, 489 [119 P. 893]: ''It is conceded that both parties paid taxes each year assessed according to the descriptions in the respective deeds. As we have seen, a division line thus established 'attaches itself to the deeds of the respective parties' and defines the lands described in each deed, so that the one in the possession of the overlap holds the title thereto by the same tenure as he holds the lands technically embraced in the description. [Citing cases.] The consequence is that under such circumstances the payment of taxes assessed in this manner is a payment on the land in the possession of the parties. Furthermore, the natural inference would be that the assessor put the value on the land and improvements of each party as disclosed by the visible possession, rather than that he ascertained the true line by a careful survey and assessed to one a part of the possession of the other.''

The judgment appealed from is affirmed.

Bray, J., and Agee, J. pro tem., concurred.