[Civ. No. 9206.    Third Dist.    Nov. 22, 1957.]

K. R. NUTTING, Appellant, v. HULBERT & MUFFLY.
INC. (a Corporation) et al., Respondents.

Spurr & Brunner for Appellant.

Kasch & Cook for Respondents.

WARNE, J. pro tem.*—This is an appeal from the judgment in favor of respondents concerning a disputed boundary line.

Plaintiff, the record owner of Lots 2, 3 and 4 of Section 31 in Township 12 North, Range 12 West, M.D.M., in Mendocino County, brought suit to enjoin a trespass upon certain portions of said lands by the defendants. Defendants and cross-complainants denied the alleged trespass and by way of cross-complaint alleged that they were the owners of the land on which the plaintiff claimed the trespass occurred. The trial court found for the defendants and cross-complainants and also found that a fence separating the properties was an agreed boundary line, and entered judgment in favor of the defendants and cross-complainants.

Section 31 is a closing section of the township and the west boundary thereof is a correction line. The west half of the section was divided into four irregular lots, each bounded on the east by the center line of the section. The south quarter corner was known. However, the north quarter corner of the section had been lost for many years and was not discovered until a survey was made in 1954. The section corner common to Sections 25 and 36 of Township 12 North, Range 13 West, and Sections 30 and 31 of Township 12 North, Range 12 West, was known. The north quarter corner was actually some 1,100 feet further east from the common corner than called for by the government field notes and the plat made therefrom.

Separating lands of the contestants on east and west was a wire fence fixed to posts—and in some instances to trees—which runs generally in a north-south direction. The first part or section of this fence had been in place for some 30

---

*Assigned by Chairman of Judicial Council.

years except for a short distance at its southerly end where no fence existed. The second part of this fence runs in a southeasterly direction to a point on the south side of Lot 3, where it veers and runs easterly. This latter fence was erected about 20 years ago by appellant after a conversation with a Mr. Vollenweider, a predecessor in interest of appellant Nutting who agreed to its location. It joins the first part of the fence, so that the whole can be said to be one continuous fence.

Mr. Vollenweider testified that he had first leased the land in 1925 and purchased it in 1943; that during the time he owned the property he had a conversation with Mr. Hulbert about the first fence and as far as he was concerned it was agreed to be the boundary line; that he was under the impression that the property crossed the fence line in one or two places; either his property went over, or the other property came back, so it was agreed that it would be about an equal swap, so the fence was left where it was; that he knew it wasn't the true boundary but he did not know where the true boundary was. Mr. Vollenweider also testified that at the time he had this conversation with Mr. Hulbert, Hulbert and Bridges were building the second part of the fence and he asked them whether they were going to fence down the line or go down the road, and they talked things over; that he asked them to go down the road so that he would not have to erect any more gates or cattle guards. He figured that this last proposition would be about an even swap. Appellant testified that the first part of the fence was in existence in the early 1920's; that he had a conversation with Mr. Vollenweider when he was building the second part of the fence and they agreed that the fence should run along a road instead of crossing it; that the fence as built was so close to the line that it would be accepted as a give and take proposition; that at the time the fence was accepted as a boundary he did not actually know where the lines were on the easterly boundaries of Lots 1, 2 and 3, but he knew that the fence was not actually on the line and that thereafter no one except the defendants used the property east of the fence.

Appellant had the property surveyed along the north line in an endeavor to ascertain his west boundary. The north quarter corner could not be located so they chained in from the common corner 1,549.68 feet but at the same time they endeavored to reconcile the discrepancies along the south part of the section and found that there was a discrepancy of some

500 to 600 feet betweeen what they believed to be the west boundary of the section and the center line of the section. The discrepancy was caused by an error of some 1,000 feet in the field note calls but it was not until the actual north quarter monument was found in 1954 that the error became apparent.

The trial court found that for well over 30 years ancient fences separated the property; that from 1920 to 1943 the respective owners acquiesced in, recognized and accepted these fences as the boundaries between their properties; that the fences constituted an agreed boundary; that in 1943 Vollenweider and Hulbert, the respondent, expressly agreed that the entire north-south fence would constitute an agreed boundary; that at the time the express agreement was made the respective owners were each uncertain of the true position a surveyed boundary line would occupy on the ground; that both believed the old fence and the new fence section approximated the true position on the ground of a surveyed boundary line; and that in 1943 the fence lines were recognized as a boundary line. Appellant argues that there is no evidence whatever in the record that the second fence ever existed or was ever considered as a boundary between the lands of the two owners. We do not believe that there is any merit in this contention. Mr. Vollenweider, as previously stated, testified in very clear and understandable language that there was an agreed boundary line between the two properties. The subject of the boundary between the properties arose because respondents were building a fence along the southerly line of the N.W.¼ of the S.E.¼ and thence up to the point of the Rancheria Creek fence line where the ancient fence stopped. At that time and place a discussion and agreement was had as to the boundary lines between Vollenweider and Hulbert. Vollenweider testified: "It has been there so many years, as far as I was concerned it is an agreed boundary line. Q. You told him that fence would be the agreed boundary line between your two properties? A. Yes. . . . We agreed that would be the line, and let it go at that. Q. Is that what you did on this occasion? A. Yes. Q. And after that discussion did you accept the fence line as your easterly boundary of Lots 2 and 3? . . . A. Yes. Because I was always under the impression the property crossed that fence in one or two places; either my property went over or the other property came back. So we agreed it would be about an equal swap, so we left the fence where it was."

Mr. Hulbert testified clearly that the entire fence line—the ancient Rancheria Creek fence, with the additions built in 1943—was an agreed boundary line pursuant to the discussion with Vollenweider in 1943. He testified: "Well, it was just so close to the line that we figured that we would just accept it as a give and take proposition, a line through there as a dividing line. Q. Is that what was said? A. Yes. Q. And from that time on did you accept that as your westerly boundary? A. We did. . . . Well, we just agreed to take that as a dividing line."

Both parties were uncertain as to where the "true" line actually ran. Hulbert testified: "Well, we didn't know exactly where the true line was." And Vollenweider's testimony was: "Q. You didn't know where your east line was? A. Not down to the acre; no."

This testimony is sufficient to support the finding that there was an agreement that the fence was to be the boundary between the two tracts of land.

Appellant next contends that an agreed boundary cannot be established by the agreement of two adjoining owners when both owners know the fence does not follow the true subdivisional boundary between them, except by deed. There is no merit in this contention. Here there was not only an agreement as to the boundary line but long acquiescence by the parties that the fence be the division line between the two tracts of land. ▉ "When owners of adjoining lands have acquiesced for a considerable time, at least equal to the period prescribed by the statute of limitations, in the location of a division line between their lands, although it may not be the true line according to the calls of their deeds, they are thereafter precluded from saying it is not the true line." (*Martin* v. *Lopes,* 28 Cal.2d 618, 622 [170 P.2d 881], citing *Sneed* v. *Osborn,* 25 Cal. 619, 627.) ▉ Further, in *Martin* v. *Lopes, supra,* the statement is made that in order to invoke the doctrine of agreed boundaries all that need be shown is lack of knowledge by both parties where the fence line should be drawn.

▉ The fact that an accurate survey is possible is not conclusive of the question of whether a doubt exists as to the location of the boundary. The doubt may arise from the believed uncertainty which may be inferred from the circumstances surrounding the parties at the time the agreement was deemed to have been made and if, in good faith, the parties resolve their doubt by fixing the location of the common

boundary it will be considered the boundary called for in the deed. (*Mello* v. *Weaver,* 36 Cal.2d 456 [224 P.2d 691] ; *Madera School Dist.* v. *Maggiorini,* 146 Cal.App.2d 390 [303 P.2d 803].)

We conclude that the judgment is supported by the evidence and the findings.

The judgment is affirmed.

Peek, Acting P. J., and Schottky, J., concurred.

A petition for a rehearing was denied December 19, 1957, and appellant's petition for a hearing by the Supreme Court was denied January 15, 1958. Schauer, J., and Spence, J., were of the opinion that the petition should be granted.