[Civ. No. 21225. First Dist., Div. One. July 16, 1964.]

WILLIAM A. JANES et al., Plaintiffs and Appellants, v. GEORGE M. LeDEIT et al., Defendants and Respondents.

Malovos, Mager & Chasuk, Alfred P. Chasuk and Orville C. Casteel for Plaintiffs and Appellants.

John Corry Fell for Defendants and Respondents.

MOLINARI, J.—Plaintiffs appeal from a judgment in a nonjury case arising out of cross-actions in ejectment.

## Statement of the Case

Plaintiffs and defendants are adjoining landowners. The within action involves a dispute over an area of land approximately 400 feet wide. Plaintiffs, claiming ownership of this area, brought an action in ejectment against defendants. Defendants, in turn, cross-complained in ejectment against plaintiffs seeking the removal of a cabin erected by the latter within said disputed area. The trial court found that title to this area is in defendants upon the basis of agreed boundary, adverse possession, estoppel and laches. The lower court thereupon concluded that plaintiffs have no right, title or interest

in the disputed tract and that defendants are entitled to a writ of possession to restore them to possession and to eject plaintiffs from said area.

### Questions Presented

1. Is the finding of agreed boundary erroneous?

2. Is the finding of adverse possession erroneous?

3. Is the finding that plaintiffs are estopped and barred by laches erroneous?

### The Record

Defendants George M. LeDeit and Ruth K. LeDeit (hereinafter sometimes called LeDeit), purchased the northeast quarter of the northeast quarter of section 33, Township 6 South, Range 4 East, Mount Diablo Base and Meridian from Austin Drinkwater on July 7, 1944.[1] Following the purchase of the land from Drinkwater, LeDeit obtained government field notes of section 33 and turned them over to Fred Chrystal, who was not a licensed surveyor but had had experience in the surveying field.[2] Both LeDeit and Chrystal entered upon the land for the purpose of surveying the land and locating the boundaries. Using the field notes, Chrystal located an oak tree bearing markings and numbers and fixed the location of a corner (referred to herein as ''Point A'') in relation to such tree and erected a rock mound at such corner. In terms of distance, the oak tree is approximately 50 feet southwest of Point A, which was understood to be the corner of the northeast quarter of section 33. From Point A, Chrystal shot a line due north across the San Antonio Creek finding a pine tree on the far bank with a blaze on it. However, the pine tree and blaze did not have any reference to the field notes. Then Chrystal shot a line due south, past Point A, and established the southeast corner of the parcel. Chrystal and LeDeit returned to Point A and shot a due west line, from east to west, establishing the northwest corner. On this westerly line, three trees were located and blazed. (The trees are referred to as ''witness trees'' and are designated ''WT #2,'' ''WT #3,'' ''WT #4.'') LeDeit did not establish the southwest corner because it was situated in a heavy brush area.

Shortly after the erection of the rock mound at Point A

---

[1] All of the lands mentioned in this opinion are located in the Mount Hamilton region of Santa Clara County.

[2] These field notes were admitted in evidence in the court below.

and the marking of the witness trees, LeDeit entered upon the property with the coterminous landowner, Patrick Greene. LeDeit showed Greene the oak tree that was located, the rock mound referred to as Point A and the three witness trees located and blazed on the western line. LeDeit advised Greene that the monuments so shown established the true division line between the properties. Greene made no objection to such a boundary; nor did he make any statement to the effect that he would be willing to abide by the line. Thereafter, and in 1945, LeDeit constructed a cabin, tool chest, shower room, an outhouse, a stone barbecue pit, a water tank and an outdoor meat cooler on his land in close proximity to the line which he had pointed out to Greene as being the boundary line between their respective lands.[3] There is testimony in the record indicating that in 1957 Greene stated that he believed the LeDeit cabin was on his property.

Patrick Greene died on January 8, 1958, leaving an estate which included the lands coterminous to those of LeDeit.[4] The lands in Greene's estate were sold, pursuant to probate sale, to William F. Ehlert in June 1958.[5]

On March 16, 1959, plaintiffs, William A. Janes and Mildred Joan Janes, his wife (hereinafter sometimes called Janes), purchased the southwest one-quarter of the southwest one-quarter of section 27; and the northwest one-quarter of the northwest one-quarter of section 34 and the southeast one-quarter of the southeast one-quarter of section 28 in Township 6 South, Range 4 East, Mount Diablo Base and Meridian from William F. Ehlert and Alleene M. Ehlert, his wife.[6] The southeast one-quarter of the southeast one-quarter of section 28 is contiguous to the northeast quarter of the northeast quarter of section 33 owned by LeDeit. Janes had the property, so purchased by him, surveyed. According to this survey the true boundary line between the LeDeit and

[3]LeDeit's property taxes reflect the presence of these improvements.

[4]At the time of his death Greene was a widower, his wife, Sayde Greene, having predeceased him on December 17, 1951.

[5]These lands are described as the southwest one-quarter of the southwest one-quarter of section 27; the south one-half of the southeast one-quarter of section 28; and the northwest one-quarter of the northwest one-quarter of section 34; all in Township 6 South, Range 4 East, Mount Diablo Base and Meridian.

[6]Of the lands acquired from the estate of Greene, contained in section 28, Ehlert retained the southwest one-quarter of the southeast one-quarter of said section, and granted to Janes the southeast one-quarter of the southeast one-quarter of said section.

Janes properties was a line approximately 400 feet south of the line which LeDeit had pointed out to Greene as the division line between their respective properties. The effect of the Janes survey was to place the LeDeit cabin and the aforementioned improvements within the confines of the Janes property. A dispute arose between Janes and LeDeit over the area between the boundary lines established by the respective surveys. This area contains 17.70 acres. Following his survey, Janes constructed a cabin on the disputed area approximately 150 feet from the LeDeit cabin. The LeDeits have occupied the disputed area from the time of the erection of the cabin in 1945 to the present time.[7]

The trial court found that the Janes survey correctly set forth the true boundary line of the lands owned by the respective parties, as it appeared of record, but found that Greene and LeDeit had agreed that the boundary established by the latter was the true division line between the properties. The court below also found that LeDeit has been in open, notorious, exclusive, continuous, uninterrupted, hostile and adverse possession of all of said disputed premises up to said division line and agreed boundary since July 10, 1944; has made thereon the improvements hereinabove mentioned; and has duly paid all taxes levied against said premises. The trial court accordingly concluded that the boundary agreed upon is the division line between the lands of Janes and LeDeit; that Janes is estopped from denying said agreed boundary; that Janes is barred by laches from recovering possession of the parcel in question; that by virtue of the law relating to adverse possession, the possession of the disputed area by LeDeit has ripened into title thereto vested in LeDeit; that LeDeit is the owner in fee of said tract; that Janes has no right, title or interest therein; and that LeDeit is entitled to a writ of possession of said tract and to eject Janes therefrom.

### Agreed Boundary

█ In order to establish a title by agreed boundary it is necessary to show that there was an uncertainty as to the true boundary line, an agreement, express or implied, between the coterminous owners fixing the line, and acceptance and acquiescence in the line so fixed for a period equal to the statute of limitations or under such circumstances that substantial loss would be caused by a change of its position.

---

[7]Other pertinent facts will be discussed under the headings of this opinion to which they are applicable.

(*Ernie* v. *Trinity Lutheran Church*, 51 Cal.2d 702, 707 [336 P.2d 525]; *French* v. *Brinkman*, 60 Cal.2d 547, 551 [35 Cal. Rptr. 289, 389 P.2d 1]; *Mello* v. *Weaver*, 36 Cal.2d 456, 459-460 [224 P.2d 691]; *Fobbs* v. *Smith*, 202 Cal.App.2d 209, 214 [20 Cal.Rptr. 545].)[8] ■ "It is not required that the true location be absolutely unascertainable [citation]; that an accurate survey from the calls in the deed is possible [*sic*] [citation], or that the uncertainty should appear from the deeds [citation]. The line may be founded on a mistake. [Citation.]" (*Ernie* v. *Trinity Lutheran Church, supra,* at pp. 707-708.)

■ The object of the rule confirming occupation according to an agreed line "is to secure repose, to prevent strife and disputes concerning boundaries, and make titles permanent and stable"; and the rule not only binds the parties, but also their successors by subsequent conveyances.[9] (*Young* v. *Blakeman*, 153 Cal. 477, 482 [95 P. 888]; *Martin* v. *Lopes*, 28 Cal.2d 618, 623 [170 P.2d 881].) ■ It is also established by the authorities that the line so agreed upon becomes in legal effect the true line; that the agreement as to the line may be in parol; that it does not operate to convey title to the land which may lie between the agreed line and the true line, but fixes the line itself and the description carries title

---

[8]As the latest expression by the Supreme Court, this appears to be the true and correct rule in California. Although not expressly overruled by *Trinity, French* and *Mello,* other authorities appear to insist on certain elements which are not found in these cases. Accordingly, the rule has been stated thusly: "[I]n order to establish an agreed boundary line it is necessary to show that there was an uncertainty or belief of uncertainty in the location of the line, that there was an agreement, express or implied, fixing the line, and that there was an actual designation of the line upon the ground and occupation in accordance therewith." (*Roberts* v. *Brae*, 5 Cal.2d 356, 358 [54 P.2d 698]; see also *Pilibos* v. *Gramas*, 104 Cal.App.2d 353, 356 [231 P.2d 502]; *Muchenberger* v. *City of Santa Monica*, 206 Cal. 635, 642 [252 P. 727]; *Martin* v. *Lopes*, 28 Cal.2d 618, 625 [170 P.2d 881]; *Talmadge* v. *Moore*, 98 Cal.App.2d 481, 484 [220 P.2d 588].) Some authorities have required that the period of acquiescence be at least equal to the period of the statute of limitations and have considered that such consent might be for a lesser period based on the element of substantial loss. (*Silva* v. *Azevedo*, 178 Cal. 495, 497 [173 P. 929]; *Schneider* v. *Pascoe*, 47 Cal.App.2d 709, 712 [118 P.2d 860]; *Nutting* v. *Hulbert & Muffly, Inc.*, 155 Cal.App.2d 464, 468 [317 P.2d 1007].)

[9]In the instant case it was stipulated that the title to the Janes property devolved from Patrick Greene to Ehlert and from Ehlert to Janes.

up to the agreed line regardless of its accuracy; that the division line thus established attaches itself to the deeds of the respective parties, and simply defines, not adds to, the lands described in each deed; and that if more is thus given to one than the calls of his deed actually require, he holds the excess by the same tenure that he holds the main body of his lands. (*Young* v. *Blakeman, supra,* at p. 482; *Martin* v. *Lopes, supra,* at pp. 623-624; *Ernie* v. *Trinity Lutheran Church, supra,* at pp. 708-709.) With respect to the payment of taxes each coterminous owner is deemed to have paid them according to his deed. (*Ernie* v. *Trinity Lutheran Church, supra,* at p. 709.) In *Clapp* v. *Churchill,* 164 Cal. 741, 745 [130 P. 1061], the rationale underlying this doctrine is stated thusly: "[T]he doctrine of an agreed boundary line and its binding effects upon the coterminous owners rests fundamentally upon the fact that there is, or is believed by all parties to be, an uncertainty as to the location of the true line. When that uncertainty exists, or is believed by them to exist, they may amongst themselves by agreement, fix the boundary line, and that agreement will bind all the consenting parties. Acquiescence is merely evidence of the agreement and can properly be considered as evidence of an agreement only when a formal agreement would itself have made a binding contract."

We now turn to the instant case in the light of the foregoing principles. Our first inquiry is whether there is evidence in the record sustaining an inference that there was uncertainty as to the true boundary line. ■ "The word 'uncertainty' is used in the statements of the rule in the decisions to convey the idea that at the time of the location of the division line neither of the coterminous owners knew the true position of the line on the ground." (*Nusbickel* v. *Stevens Ranch Co.,* 187 Cal. 15, 19 [200 P. 651].) ■ To invoke the doctrine of agreed boundary, it need only be shown that the uncertainty present at the time of the agreement is a lack of knowledge by both parties of where the true line is or should be drawn. (*Martin* v. *Lopes, supra,* at p. 626.) In the present case neither of the deeds by which the respective parties obtained title to the land contains a description either by courses or distances, metes and bounds or by natural monuments.[10]

---

[10]LeDeit's deed from his predecessor, Drinkwater, describes the property conveyed to him as follows: "The Northeast quarter of the Northeast quarter of Section 33, Township 6 South, Range 4 East of the

Plaintiffs contend that no dispute or uncertainty existed. There is nothing in the record to indicate that there was a dispute between the LeDeits and Greene. ■ It is apparent from the authorities that an actual dispute between the parties is not required, the necessary element being *uncertainty* as to the true boundary line. The existence of a dispute would merely be evidence going to the issue of uncertainty. There is ample evidence in the record from which the court could infer that there was uncertainty as to the true boundary insofar as Greene and LeDeit were concerned. Before proceeding to a discussion of such evidence, it is convenient to point out here that there is nothing in the record to show that the respective spouses participated in any of the conversations or activities related to the division line in question. Plaintiffs urge that there can be no agreed boundary in the instant case because there is no evidence that Sayde Greene, as a joint tenant, consented to or acquiesced in the boundary, and that therefore she was not bound by the act of her joint tenant husband in purporting to agree and acquiesce in the division line in question.[11] We shall hereinafter discuss this contention.

■ Turning to the evidence supporting the finding of uncertainty, the record discloses that following a conversation between LeDeit and Greene about a month after LeDeit purchased the property, he caused the land to be surveyed by Chrystal. LeDeit testified that he called for Greene in San Jose; that they drove to a campsite on Greene's land; that he showed Greene "the tree we found, which he expressed surprise at"; that they "went out to this corner"; that he told Greene "where that corner was, and the north and south line"; that he showed Greene "the trees that we had marked on the westerly course"; and that

---

Mt. Diablo Meridian, California, containing about 40 acres." The deed by which the Greenes took title is not a part of the record. However, the deed by which Janes acquired title from his predecessor, Ehlert, was admitted in evidence, as was the probate file in the estate of Patrick Greene showing the devolution of title from Greene to Ehlert. The description of the land in these respective conveyances has hereinbefore been set out.

[11]The same argument might be advanced with respect to Mrs. LeDeit, who did not testify at the trial, and who acquired the LeDeit property in joint tenancy with her husband. No such point is made by plaintiffs on this appeal. Moreover, by joining with her husband as a party plaintiff in the cross-complaint it is reasonable to assume that she acquiesced to and ratified the acts of her husband.

Greene at no time made "any objection to these boundaries. . . . " This evidence, when coupled with Greene's acquiescence for over 13 years to the division line located by LeDeit, warranted the inference that there was uncertainty in the minds of LeDeit and Greene as to the location of the true boundary line. The trial court was justified, moreover, in the inference that LeDeit made a good faith attempt to locate the true boundary but that he made a mistake as to its location. ▮ As hereinabove pointed out an agreed boundary may be founded on a mistake. (*Ernie* v. *Trinity Lutheran Church, supra,* at p. 708; *Nusbickel* v. *Stevens Ranch Co., supra,* at p. 19.) The intention essential to the establishment of an agreed boundary is not merely to mark the true line, but also to accept such line as the true boundary line. (*Martin* v. *Lopes, supra,* at p. 626.) The argument advanced by plaintiffs that the true boundary line could have been ascertained from the government survey and field notes is answered by the rule hereinabove stated in *Trinity* that uncertainty may exist even though an accurate survey from the calls in the deed is possible. (See also *Silva* v. *Azevedo,* 178 Cal. 495, 498 [173 P. 929].)

▮ It is argued by plaintiffs that the second element is nonexistent, i.e., that there was no agreement fixing the boundary. The agreement, as already pointed out, need not be in writing; it may rest in parol or be implied from the conduct of the parties. Such an agreement may be inferred from LeDeit's conversation with Greene when he pointed out the boundary to him and by Greene's failure to object to it. It may also be inferred from Greene's long-standing acceptance of the marked boundary. In *Trinity,* we find the following statement, which, upon analogy, is applicable to the present case: "The court may infer that there was an agreement between the coterminous owners ensuing from uncertainty or a dispute, from the long-standing acceptance of a fence as a boundary between their lands." (P. 708.) In the instant case, while no fence was erected along the line designated by LeDeit, he did point out to Greene the three witness trees, in line with each other, as the physical markings along said boundary line, and with Greene's knowledge and acquiescence erected his cabin and the other improvements in close proximity thereto.

Upon close scrutiny plaintiffs' argument appears to rest upon the thesis that LeDeit's survey was incomplete. They contend that LeDeit shot a due east-west line and blazed

trees in that general direction but that no further survey action was taken. The evidence shows that LeDeit and Chrystal found a cluster of rocks that could have been a mound at one time, and that the latter understood such was the corner of the northeast quarter of section 33. Plaintiffs assert that LeDeit only marked one corner by shooting a due west line— east-west, but the record indicates that LeDeit and his surveyor marked three corners of the area in question, the northwest, the northeast, and the southeast. On cross-examination LeDeit admitted that Chrystal did not fix a due east-west line connecting the southeast corner with the southwest corner. Plaintiffs rely upon *Pilibos* v. *Gramas*, 104 Cal.App. 2d 353 [231 P.2d 502], for the proposition that where a party conducts a haphazard survey resulting in an incorrect boundary, there can be no agreed boundary. Plaintiffs misconceive the holding of *Pilibos*. There the party attempting to establish a boundary found what he believed to be a section corner, but did not look for any other section corner. He thereupon plowed a line each way, keeping in line with the supposed section corner. A reading of *Pilibos* discloses that the reviewing court was not concerned with the manner in which the boundary was set, but with the paucity of evidence on the question whether the parties agreed to accept the marked boundary line. In that case, as distinguished from the case at bench, there was no help from a surveyor nor was there any reliance upon field notes. In the instant case, LeDeit testified that he and Chrystal found a bearing tree in the field notes from which they proceeded to mark the corners hereinbefore described. Of particular significance, in the present case, is the fact that the boundary in question was marked by shooting a line from Point A (the northeast corner) to the northwest corner. ■ We are persuaded from a reading of the authorities, moreover, that the doctrine of agreed boundary is not concerned with the validity or propriety of the method by which the proposed line is marked, but whether the parties agree to accept such line as the true line. Nothing in *Pilibos* indicates differently. Accordingly, the accuracy of the proposed line is of no moment as long as it appears that the parties have agreed to accept it as the boundary.

Plaintiffs also contend that the line proposed by LeDeit was not marked out as definite and certain. They argue that the line must be marked out and the actual location agreed upon by both parties. ■ There is no requirement, how-

ever, that the boundary must be physically marked on the surface of the ground. (*Rose* v. *Silva,* 189 Cal.App.2d 760, 767 [11 Cal.Rptr. 492].) ''The test is whether the parties have agreed upon a dividing line that is clear to them, and that can be made clear to others.'' (*Carr* v. *Schomberg,* 104 Cal. App.2d 850, 859 [232 P.2d 597] ; see *Needham* v. *Collamer,* 94 Cal.App.2d 609, 612 [211 P.2d 308] ; *Rose* v. *Silva, supra,* at p. 767.) The primary question is one of fact going to the question whether there was an agreed boundary, and, if so, by what visible thing it was delineated. (*Needham* v. *Collamer, supra,* at p. 612.)　　　Applying these principles to the case at bench, there was sufficient evidence to support the trial court's finding that the boundary was sufficiently delineated by visible objects that were clear to Greene and LeDeit and which could be made clear to others. These consist of the rock mound (Point A) and a witness tree marking the eastern terminus of the line, a blazed pine tree marking the western terminus, and a blazed oak and a blazed pine approximately equidistant along the boundary line.

We now turn to the question as to whether the consent of Greene's wife, Sayde, was required in order to establish the agreed boundary. The record is barren of any consent or acquiescence on her part.[12] The briefs of each of the parties concede that the Greene property was acquired by them in joint tenancy. Plaintiffs rely upon the well-settled rule that one joint tenant, or tenant in common, cannot bind his cotenant by any contract which he may make relating to the common property without the joinder or acquiescence of such cotenant. (See *Caffroy* v. *Fremlin,* 198 Cal.App.2d 176, 185 [17 Cal.Rptr. 668] ; *Carbine* v. *Meyer,* 126 Cal.App.2d 386, 392 [272 P.2d 849] ; *Oberwise* v. *Poulos,* 124 Cal.App. 247, 251 [12 P.2d 156] ; *Cosgrave* v. *Donovan,* 52 Cal.App. 625, 629 [199 P.2d 808, 810].) Defendants argue that the property was community property and that therefore the husband, as the manager of the community real property, could, by his conduct, bind his wife to an agreed boundary pursuant to section 172a of the Civil Code.[13]

---

[12]There is no evidence that Mrs. Greene was ever physically present in the area which is the subject of this litigation.

[13]Civ. Code, § 172a, in pertinent part provides: ''[T]he husband has the management and control of the community real property, but the wife, either personally or by duly authorized agent, must join with him in executing any instrument by which such community real property or any interest therein ... is sold, conveyed, or encumbered; ...''

Notwithstanding the cavalier concession by the parties to this appeal that the Greene property was held in joint tenancy there is nothing in the record to sustain it. At the trial plaintiffs introduced in evidence, without objection, the probate file in the estate of Sayde Greene for the purpose of showing that she was a joint tenant of the subject property with her husband. A perusal of this file discloses that it in no wise relates to the real property in question, but to the termination of a joint tenancy interest in other property located in the City of San Jose. We are mystified, to say the least, how this fact could have escaped the attention of counsel for both parties and the trial court.

The probate file in the estate of Patrick Greene was likewise admitted in evidence as plaintiffs' exhibit No. 12 without objection. This file discloses that the Greene property coterminous to LeDeit's lands was inventoried in said estate and sold, as hereinabove pointed out, at probate sale to Ehlert. The record being barren as to when this property was acquired by Greene, or the parties in whom title thereto was vested, the inference is warranted, in view of the omission of this property from the wife's estate (she having predeceased Patrick), that it was his separate property. Accordingly, as the sole owner of such property only his consent and acquiescence were necessary. Assuming, *arguendo*, that the inference could be drawn that the property was community property because Patrick was married to Sayde during some of the time covered by the occurrences which are the subject of this opinion, the same result is reached. We are satisfied that under section 172a of the Civil Code a husband, having the management and control of the community property may enter into an agreement to settle a boundary without his wife's express consent because as such manager he acts as her representative. The position of a husband in whom the management and control of the entire community estate is vested by Civil Code sections 161a, 172 and 172a is frequently analogized to that of a partner, agent or fiduciary. (*Vai* v. *Bank of America,* 56 Cal.2d 329, 338 [15 Cal.Rptr. 71, 364 P.2d 247]; *Fields* v. *Michael,* 91 Cal.App.2d 443, 447 [205 P.2d 402]; *Grolemund* v. *Cafferata,* 17 Cal.2d 679, 684 [111 P.2d 641]; *Estate of McNutt,* 36 Cal.App.2d 542, 552 [98 P.2d 253].) In the application of the doctrine of agreed boundary we are not dealing with the sale, conveyance, or encumbrance *requiring the execution of an instrument* in which the wife must join, but rather with *conduct* which

results in the consent and acquiescence required by the doctrine. ■ Moreover, taking note that even after Sayde's death Patrick continued to accept and acquiesce in the line so fixed for a period in excess of the statute of limitations, we are impressed that a principle already enunciated in this opinion is applicable under the circumstances, to wit: that a court may infer that there was an agreement between the coterminous owners ensuing from uncertainty from the long-standing acceptance of a fence or other physical monuments as a boundary between their lands. Accordingly, such an inference may be drawn from the acceptance of the three witness trees along the line in question by Greene and LeDeit from the date of Sayde's death on December 17, 1951, to Greene's demise on January 8, 1958.

■ Finally, the contention is made by plaintiffs that no substantial loss would result to defendants from a change of the boundary line. This argument is one that might properly be urged by defendants rather than plaintiffs. The concept of substantial loss is, in reality, an exception to the statute of limitations requirement. This rule, when invoked, has the effect of shortening the period of acquiescence on the ground that it would be highly inequitable to compel a party who has relied on the agreed boundary to remove his improvements because acquiescence for the period of limitations has not occurred. Accordingly, although this exception might be available to defendants, it does not come into play because in the instant case we have acceptance and acquiescence in the line fixed for a period in excess of the statute of limitations.

### Adverse Possession

■ The trial court's finding of adverse possession was erroneous. We believe the doctrine of agreed boundary to be incompatible with the rule applicable to title by adverse possession. (See *Rast* v. *Fischer,* 107 Cal.App.2d 129, 134 [236 P.2d 393].) The doctrine of agreed boundary presupposes that pursuant to agreement the line agreed upon is in legal effect the true line, and that the coterminous owner who holds the excess does so by the same tenure as he holds the main body of his lands. (*Young* v. *Blakeman, supra,* 153 Cal. 477, 482; *Martin* v. *Lopes, supra,* 28 Cal.2d 618, 623-624; *Ernie* v. *Trinity Lutheran Church, supra,* 51 Cal.2d 702, 708-709.) One who acquires title by agreed boundary does so upon the basis of an *agreement* ensuing from uncertainty and, in essence, enters into occupation of the excess land by permission of the adjoining landowner. The rule is settled

that title by adverse possession cannot be acquired where the occupant has entered into possession by permission or consent of the owner. (2 Cal.Jur.2d, Adverse Possession, § 45, p. 550; § 48, pp. 553, 554; *Huntley* v. *San Francisco Sav. Union*, 130 Cal. 46, 48 [62 P. 255]; *Allen* v. *McKay & Co.*, 139 Cal. 94, 97-98 [72 P. 713].) The principle of adverse possession is distinguished from that of agreed boundary in that in the former the possession is *hostile* and against the wish and will of the owner (2 Cal.Jur.2d, Adverse Possession, § 45, p. 550; *Cohen* v. *Anderson*, 22 Cal.App. 634, 643 [135 P. 1096]), while in the latter it is with the owner's authority and consent.

## Estoppel

As indicated by its findings of fact and conclusions of law, the trial court's finding of estoppel is predicated upon the same facts upon which it made its finding of agreed boundary. Although we are of the opinion that a finding of estoppel was not necessary to the present case, no error was committed by the court below when it made such a finding. We are satisfied that under the authorities estoppel is implicit in a finding that coterminous owners have settled a boundary under the agreed boundary doctrine. As stated in *Martin* v. *Lopes, supra*: "[W]hen owners of adjoining lands have acquiesced for a considerable time, at least equal to the period prescribed by the statute of limitations, in the location of a division line between their lands, although it may not be the true line according to the calls of their deeds, they are thereafter *precluded from saying it is not the true line.*" (P. 622; italics added; citing *Sneed* v. *Osborn*, 25 Cal. 619, 627; see *Nutting* v. *Hulbert & Muffly, Inc.*, 155 Cal.App.2d 464, 468 [317 P.2d 1007]; *Ball* v. *Harder*, 167 Cal.App.2d 168, 172 [334 P.2d 84]; *Young* v. *Blakeman, supra*, at pp. 482-483; *Clapp* v. *Churchill, supra*, 164 Cal. 741, 745-746; *Vowinckel* v. *N. Clark & Sons*, 217 Cal. 258, 260 [18 P.2d 58].) In *Loustalot* v. *McKeel*, 157 Cal. 634, 641 [108 P. 707], we find the following statement: "[W]here parties in good faith establish a boundary line which may not be in fact the true line according to the calls of their deeds, and in which they acquiesce and according to which they occupy their respective lands for a period of time equal to that prescribed by the statute of limitations, both parties and their successors in interest are *conclusively estopped* from questioning it as the true line." (Italics added.) And in *Copley* v. *Eade*, 81

Cal.App.2d 592, 593 [184 P.2d 698], it is stated as follows: "Essentially, the doctrine is a mixture of implied agreement and estoppel. [Citations.]"

*Laches*

■■■ The trial court concluded that "Plaintiffs are barred by their own laches from recovering the possession of any of the land lying South of such agreed boundary from Defendants." "Laches is an unreasonable delay in asserting a right which causes such prejudice to an adverse party as renders the granting of relief inequitable. . . . " (*Butler* v. *Holman,* 146 Cal.App.2d 22, 28 [303 P.2d 573]; see also *Cahill* v. *Superior Court,* 145 Cal. 42, 46 [78 P. 467]; *Kleinclaus* v. *Dutard,* 147 Cal. 245, 249 [81 P. 516].) The existence of laches is a question for the trier of fact, whose determination will not be disturbed by a reviewing court unless there is an abuse of discretion. (*Beckett* v. *Kaynar Mfg. Co., Inc.* 49 Cal.2d 695, 700 [321 P.2d 749]; *Smith* v. *Sheffey,* 113 Cal. App.2d 741, 744 [248 P.2d 959].) In the case at bench the conclusion reached by the trial court is not only unsupported by any finding of fact, but there are no facts upon which such a finding could be predicated. Apparently, the court below has imputed Greene's delay to plaintiffs. We are here concerned with the delay on plaintiffs' part. They acquired their property on March 16, 1959, and thereafter had it surveyed. The instant action was filed on August 11, 1960. We do not believe, in the absence of other compelling circumstances, that laches may be predicated on this comparatively brief span of time, particularly when defendants' position was in no way altered to their detriment during such period. Plaintiffs cannot prevail in this action because of the doctrine of agreed boundary which fastens upon them the agreement and acquiescence of their predecessors to such boundary. Were it not for the application of such doctrine, we doubt that plaintiffs would be barred from recovery because of laches.

The judgment is affirmed with directions to the trial court to amend and modify its findings of fact and conclusions of law with respect to adverse possession and laches in accordance with the views herein expressed. Defendants-respondents to recover costs on appeal.

Bray, P. J., and Sullivan, J., concurred.

A petition for a rehearing was denied August 3, 1964.